**Raymond SPECTOR, Plaintiff-Appellee-Appellant,**

v.

**Milton E. MERMELSTEIN, Defendant-Appellant-Appellee.**

**Nos. 988–990, Dockets 72–1939, 73–1198, 73–1209.**

United States Court of Appeals, Second Circuit.

Argued June 20, 1973.

Decided Sept. 11, 1973.

---

Simon H. Rifkind, New York City (Allan Blumstein, Jack Auspitz, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendant-appellant-appellee.

Stuart A. Jackson, New York City (James J. Maloney, Melvin L. Schweitzer, John B. Koegel, Royall, Koegel & Wells, New York City, of counsel), for plaintiff-appellee-appellant.

Before FRIENDLY, FEINBERG and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

In this nine-year old, factually complex diversity suit by Raymond Spector against his attorney Milton E. Mermelstein, charging the latter with negligence and breach of fiduciary duty in his representation of Spector in certain business transactions, Judge J. Edward Lumbard, sitting by designation without a jury in the Southern District of New York, awarded $250,000 damages to Spector as compensation for loss suffered by him on two loans to the OCM Corporation ("OCM" herein). Upon this appeal Mermelstein contends that the loss was not caused by him but by Spector's own conduct. By way of cross-appeal Spector argues that under New York law it was error for the district court to have denied him prejudgment interest. We affirm the award of damages, reverse the denial of prejudgment interest, and remand for assessment of such interest.

Since the complicated factual picture is recounted in detail in Judge Lumbard's thorough opinion reported at 361 F.Supp. 30 (S.D.N.Y.1972), we see no need for repetition here other than to sketch those highlights that are essential to this opinion.

The suit below arose out of Mermelstein's representation of Spector in the making of two loans totalling $250,000 to OCM, which was the owner of a hotel and gambling casino in Reno, Nevada, operated by the Riverside Casino Corporation ("RCC" herein). Prior to his representation of Spector in the negotiation of these loans Mermelstein had on

March 4, 1962, as the representative of a different client which was considering a merger with OCM, learned that OCM and RCC were in financial difficulty. At a meeting on that date with William Miller, the principal stockholder and manager of OCM and RCC, and William Ehrens, an accountant, Mermelstein had been advised that OCM's income was derived entirely from a monthly rental of $37,500 paid to it by RCC under a lease of the hotel and gambling casino to RCC, which operated them. Each monthly rental received by OCM was used entirely by it to make a monthly payment due on three mortgages on the property aggregating $3.8 million. OCM also owed $154,000 to a Mr. Crummer, payment of which was due that week. A default in payment would result in loss of the property, since Crummer held as security for the loan a deed to the property and a cancellation of the lease of it from OCM to RCC.[1] Mermelstein rejected the merger but suggested that Miller and Ehrens contact Spector concerning a loan to cover the payment to Crummer.

On March 6, 1962, Miller, Ehrens and Spector met. At some point Mermelstein joined the meeting. Spector was told that as a result of partial payment of the $5 million dollars in mortgages on the property, which reduced the outstanding indebtedness to approximately $3.8 million dollars, OCM's equity in the property amounted to $1.2 million dollars, and that if they could pay off the $154,000 loan and continue operating the hotel and casino, the financial prospects were bright. Mermelstein failed to apprise Spector of his earlier meeting on March 4, or of the fact that OCM's monthly income from RCC was being used entirely to defray its monthly mortgage obligations. Spector agreed to loan not only the $154,000, but an additional $46,000 which was needed to renovate the hotel restaurant. The security for the loan was to be the equity in the underlying property, evidenced by the deed and bill of sale and the cancellation of the lease to RCC. In addition both Spector and Mermelstein were to receive shares of OCM stock.

During the next few days steps were taken to consummate the deal. Spector, with Mermelstein's assistance, arranged for the Bankers Trust Company to make the loan of $200,000 to OCM on March 12, 1962, against OCM's note which Spector endorsed and collateralized with his personal bankbooks. In the meantime, on March 8, 1962, Mermelstein received a telegram from Crummer's escrow agent and attorney, William Bradley, informing him that Crummer had on March 1 extended the time for payment until March 15 and that only $90,000 (rather than the sum of $154,000 earlier represented by Miller) was then due. Mermelstein failed to inquire of Miller about this apparent discrepancy. Nor did he inform Spector of the substantial difference in the amount due.

On March 11, 1962, Mermelstein attended a further meeting which underscored OCM's dire financial straits but again he failed to keep Spector informed. On that date a meeting was held by Ehrens and various third persons,[2] to which Mermelstein was invited for reasons that are not entirely clear, to discuss the possibility of a merger between OCM and Terry Industries, a company whose bleak financial outlook rivaled OCM's, at which OCM's

---

1. Judge Lumbard found that: "As security for this loan Miller had deposited with William Bradley, Crummer's nephew and attorney, the deed and a bill of sale for the property and the casino hotel, and a cancellation of the lease between OCM and RCC. Under Nevada law, a default on the loan would have enabled Crummer forthwith to record the deed and bill of sale without foreclosure proceedings or other ado."

2. Attending the meeting in addition to Mermelstein and Ehrens were Richard Terker, the president of Terry Industries, Joseph Patrick, Fred Schoeffer and Benjamin Dranow, who was later to become instrumental in arranging a large loan from the Teamsters to refinance OCM's mortgages. See *infra*.

need for $1.75 million dollars in interim financing was a prime topic of discussion. Notwithstanding this further evidence that OCM's precarious financial condition jeopardized Spector's $200,000 loan, Mermelstein failed either to delay the disbursement of the money or to inform Spector.

On March 14 Mermelstein received two letters from Bradley, the first confirming the consummation of the loan and the second noting that the deed, the bill of sale and the lease cancellation which comprised Spector's security "are not to be recorded and we have to rely on Miller's good faith in not conveying any of the properties. . . ." While the record is unclear as to whether Mermelstein had previously understood the fragile reed upon which Spector's security rested—Miller's good faith—the record is clear that as Spector's attorney he had helped to structure the transaction. Nevertheless, he failed to show Spector the second letter of March 14 or communicate the contents to him.

In late April Miller telephoned Spector to ask for an additional loan of $50,000, to be secured by the same collateral, as exigent circumstances had prevented the use of the $46,000 for the restaurant renovation. Spector testified

that he agreed to the loan after receiving assurances from Mermelstein that the loan would be adequately secured. On May 1 Mermelstein prepared a telegram outlining the terms of the loan including the delivery of two OCM shares to Spector and three shares to himself. In early May the loan was consummated.

Because of the rapidly deteriorating financial condition of the casino, which went into bankruptcy in December, 1962, the $250,000 loaned by Spector to OCM was never repaid. In this action Spector seeks recovery of the $250,000 from Mermelstein on the grounds, among others, that Mermelstein failed to exercise reasonable care and diligence in his representation of Spector and that he was guilty of both negligence and breach of fiduciary duty in failing to reveal certain material facts to Spector.[3] At trial Mermelstein, while giving a somewhat different version of some of the crucial meetings forming the basis of Spector's claim than that testified to by Spector, did not seriously dispute his own failure to disclose certain of the foregoing facts to Spector. Mermelstein's defense was based principally on his contention that Spector's loss was not caused by Mermelstein's conduct but by Spector's own decision, beginning in May, 1962, to

---

3. In his first cause of action, the one before us on appeal, Spector alleged that Mermelstein

"failed to exercise reasonable care and diligence in investigating and ascertaining the reputation, the status and true financial condition of OCM and RCC, and the principals interested in said corporations, and he failed to secure effective written guarantees from the principals in interest . . . and further failed to recommend or require any means of assuring the protection for the full payment of the entire loan . . . and to request and procure the warranties and guarantees normally required by a lender in such a secured transaction; and further failed to exact from the borrower adequate customary and usual agreements to enable the plaintiff to resort immediately to the collateral security in the event of the discovery of any wrongful act or omission . . . or of any insufficiency of such security . . . and otherwise failed to exercise the skill, diligence and care re-

quired of an attorney handling a loan transaction of a lender."

Spector's complaint also contained four other causes of action, which were either dismissed or abandoned. The second count alleged fraud in the OCM and RCC transactions. The third, which was later abandoned, claimed that Mermelstein's negligence and fraudulent conduct caused a diminution of Spector's reputation by associating him with Benjamin Dranow, an allegedly unsavory character. The fourth charged negligence and breach of fiduciary duty in connection with a different loan transaction, one involving the Rex Sierra Gold Corporation, and the fifth alleged fraud in the same transaction. Since the two fraud counts (II and V) were not pressed at trial, they were dismissed. As to the fourth cause of action, Judge Lumbard found Spector had "not established these allegations by a fair preponderance of the evidence" and therefore directed judgment for Mermelstein on the main Rex-Sierra claim.

become a gambling casino operator, which led to his extending additional personal credit to OCM, his taking over of the operation of the casino, his refinancing of the existing mortgages on the premises, the bankruptcy of the casino and the eventual sale of the underlying properties to a third party, resulting in a loss to Spector far exceeding the initial $250,000 loans. Mermelstein argued that if Spector had merely waited until October 1962, when his $250,000 loans were to become due, he could, upon OCM's default, have recouped the loans. Judge Lumbard found to the contrary, concluding that no matter what course Spector took the $250,000 would have been lost. Mermelstein here contends that this finding was erroneous.

The record supports Mermelstein to the extent of revealing that after making the initial loans of $250,000 Spector became more deeply involved in the OCM–RCC gambling casino venture. However, there was also evidence that this pyramiding of his risk was undertaken in an effort to salvage the investment already made and that it was done with the knowledge and approval of Mermelstein. On May 10, 1962, at Miller's request Spector made an additional loan of $200,000 to OCM, secured by the same collateral as the earlier loans. Miller represented that $150,000 of this latest loan was needed to pay off creditors of the casino. Shortly thereafter Frederick Wageman, an accountant whom Spector had sent to Reno to work for Miller, advised Spector that the new loans were not being used to pay these creditors. OCM's precarious financial condition was now confirmed to Spector, who was advised by Miller that Miller was not in a position to make instalment payments in repayment of the loans.

Faced with the risk that he might lose his entire investment if the venture failed Spector, after consultation with Mermelstein, agreed to a plan proposed by Ehrens and Ben Dranow for the refinancing of OCM's outstanding mortgages in the sum of $3.8 million dollars and for continued operation of the casino with a view to selling it to a buyer at a price that would enable Spector to emerge whole. Specifically the plan called for purchase of the $3.8 million dollars in mortgages at a discount for $2.75 million dollars to be obtained by way of a loan from the Teamsters Pension Fund. OCM's monthly mortgage payments would thus be reduced from $37,500 to about $20,000, making it possible to market the underlying property at a price that might enable Spector to recoup his investment. However, the Teamsters would not grant a mortgage to Miller as he was considered a poor credit risk. Accordingly on June 11 Spector replaced Miller as the operator of both OCM and RCC. Thereafter he persuaded the Teamsters Pension Fund to make the mortgage loan, which was finally consummated on October 15. When the Nevada Gambling Commission indicated that it would not approve his license to operate the casino unless he personally assumed its debts, Spector agreed to do so.

Despite Spector's participation and extension of his personal credit to keep the enterprises going, OCM and RCC continued to fare poorly. In October, when the Teamsters' $2.75 million-dollar loan was finalized, Spector was able to pay off the existing mortgages for approximately $2.3 million dollars. Although the residue, a sum in excess of $400,000, was applied to Spector's personal bank account, it was hardly sufficient to offset the large sums which he had by this time poured into these enterprises.

Following receipt of the Teamsters' loan, Spector actively sought a purchaser. In December, after the Casino had gone bankrupt, the Hughes-Porter Corporation entered into an option agreement for the purchase of the property. The sale was completed in May of 1963. Hughes-Porter agreed to assume the then existing $2.75 million dollars obligation owed to the Teamsters and to pay an aggregate of $600,000 over and above

the assumption of the Teamsters' mortgage. However, the $600,000 was not to be paid to Spector in cash. Indeed Spector initially received for himself only $50,000, which was paid on December 31, 1962. Of the balance $150,000 was deposited in escrow to defray the expenses of the sale and to clear up liens on the property and $400,000 was in the form of an instalment which was later reduced to $262,500 and then applied toward reduction of liens except for $16,000 paid to Spector, bringing the total realized by him to $66,000.[4]

Thus the price at which the property was eventually sold, $3.3 million dollars, was $500,000 less than the total amount of the mortgages amounting to $3.8 million dollars that had been on the property at the time when Spector loaned the $250,000 which is the subject of this action. Although Spector had succeeded in purchasing these mortgages in the sum of $3.8 million dollars for $2.3 million dollars, this feat was made possible only as the result of his securing a $2.75 million-dollar loan from the Teamsters Pension Fund, which was advanced only upon the basis that a viable hotel and gambling casino would continue to be operated on the premises, hopefully at the profit projected by Spector and Ehrens. There is no evidence that if Spector, after making the initial loans of $250,000, had stood by and, upon default, sought to recoup his advances through sale of the property the Teamsters or anyone else would have advanced the $2.75 million-dollar mortgage money that enabled Spector to reduce the outstanding mortgages.

In his decision dated June 30, 1972, Judge Lumbard, discrediting much of Mermelstein's testimony, found that Mermelstein had acted negligently and had breached his fiduciary duty by failing to adequately advise Spector of such material facts as the meetings of March 4 and 11, OCM's need for interim financing, the exhaustion of RCC income

to meet mortgage payments, and the insecure nature of Spector's security. Mermelstein's failure to investigate such discrepancies as the amount owing and the due date of OCM's payment to Crummer was also found wrongful. Judge Lumbard noted: "[I]f an attorney negligently or willfully withholds from his client information material to the client's decision to pursue a given course of action, or to abstain therefrom, then the attorney is liable for the client's losses suffered as a result of action taken without benefit of the undisclosed material facts." This recognized basic principle is not disputed.

With respect to Mermelstein's contention that Spector would not have lost the $250,000 had he merely waited for the loans to default, Judge Lumbard concluded that: "Mermelstein's breach of duty to Spector, however, embroiled Spector initially with RCC and OCM. . . . Indeed, from all that appears, Spector would have lost his money whichever course he chose. When he finally sold the Casino to Hughes-Porter the purchase price was $3,300,000—after Spector had reduced the mortgages from about $3,800,000 to less than $2,750,000 and the monthly payments from $37,500 to approximately $20,000. Thus the sale price was $500,000 less than the mortgages on the property when Spector loaned the $250,000. There is no evidence to indicate that, had Spector merely waited for the casino to go bankrupt and then taken over on OCM's default, he could have sold the property, heavily burdened with operating deficits in addition to the mortgages, at a price sufficient to recover his $250,000 or any part of it."

*Mermelstein's Appeal*

Turning to the merits of the main appeal, Mermelstein does not challenge here Judge Lumbard's findings of negligence or breach of fiduciary duty, nor does he contend that an inappropriate le-

---

4. Thus, except for the $66,000 realized by Spector, the great bulk of the money went to payment of lien creditors in order to re- move all clouds from the title to the property.

gal standard was applied. Mermelstein's argument is essentially that Spector has failed to show that his loss was in fact caused by Mermelstein's conduct. Spector caused his own loss, the argument goes, by not waiting until October of 1962, when the loans were due and then upon their default relying on the real estate as the underlying security. It is alleged that in actuality the causes of Spector's loss were his desire to become actively involved in the management of the hotel and casino, which led him personally to assume certain of their debts. Spector's alleged mismanagement of the operations is said to have further contributed to his losses.

Upon this review of the trial judge's findings as to causation in fact we are governed by the "unless clearly erroneous" standard of Rule 52(a), F.R.Civ. P. See United States v. Ebinger, 386 F.2d 557 (2d Cir. 1967); McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 777 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966). "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed,' United States v. Oregon Medical Society, 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978; United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746." McAllister v. United States, 348 U.S. at 20, 75 S.Ct. at 8. The essential issue is whether the conduct of the defendant was a material element or a substantial factor in bringing about the loss. See Dunham v. Village of Canisteo, 303 N.Y. 498, 506, 104 N.E.2d 872 (1952); Restatement (Second) of Torts, §§ 431 and 433 (1965); W. Prosser, Law of Torts § 41 (4th ed. 1971).

"It is not enough that the defendant, in an effort to break the chain of causation, should prove that plaintiff's injury *might* have resulted from other possible causes, nor is it required of the plaintiff that he eliminate by his proof all other possible causes." Cornbrooks v. Terminal Barber Shops, Inc., 282 N.Y. 217, 223, 26 N.E.2d 25, 27 (1940).

■ Applying these principles here, Judge Lumbard's findings as to causation in fact, far from being clearly erroneous, appear to be supported by substantial evidence.

The nub of Mermelstein's argument is that since Hughes-Porter purchased the property for $3.3 million dollars, a sum substantially in excess of the $2.3 million-dollar discount price paid to discharge the original mortgages amounting to $3.8 million dollars,[5] Spector could have obtained such a purchaser if he had waited for OCM to default on the original loans. However, this argument assumes that someone would, without any further commitment on Spector's part, have secured the minimum amount of $2.3 million dollars in cash required to discharge the mortgages. Absent persuasive evidence the trial judge was not entitled to make such an assumption. Nor is there any evidence that any purchaser would have been willing to buy at any price the property burdened by the original mortgages, with rental income barely meeting mortgage payments. A cash loan to refinance the mortgages was a prerequisite for a profitable sale. The record amply supports a finding that the $2.3 million dollars would have been unavailable unless Spector agreed to manage the casino and convinced the borrower that a cash loan was a sound investment.

Thus Spector, having been led into making the $250,000 in loans without being advised of material facts and with-

5. Throughout this appeal we have approximated the face amount of the mortgages at $3.8 million dollars or in "excess of $3.8 million," the figures primarily used by the parties and by Judge Lumbard. However, there is evidence in the record which indicates that as of October 15, 1962, the face amount of the original mortgages was $3,906,645. For the purposes of this appeal, this discrepancy is not significant.

out adequate groundwork by his counsel, was placed in the position of seeing his money go down the drain unless he could salvage his investment by becoming more involved. Mermelstein, by placing his client in this precarious position, was a substantial factor in bringing about Spector's loss and Judge Lumbard's finding that "Spector would have lost his money whichever course he chose" is not clearly erroneous.[6]

Mermelstein argues further that even if the finding of causation in fact was not clearly erroneous, his negligence was not the *proximate* cause of Spector's loss. Mermelstein insists that in spite of any initial causal relationship between his negligence and Spector's agreeing to make the loan, Spector's subsequent actions constituted an independent intervening cause that should free Mermelstein of any liability. Spector counters that his efforts at salvage were expectable and that he should have sued for his full loss. Be that as it may, Spector's efforts were clearly not the kind of superseding cause that would result in a lack of "proximateness." See ALI, Restatement of Torts 2d, §§ 440–442 (1965).

Accordingly we find no error in Judge Lumbard's decision with respect to Mermelstein's appeal and to the extent that his appeal seeks review of the trial judge's denial of his motion pursuant to Rule 60(b)(2), (3), F.R.Civ.P., to vacate and set aside the judgment upon the first cause of action on grounds of alleged newly discovered evidence and fraud, we affirm for the reasons stated by Judge Lumbard in his opinion dated December 18, 1972.

*Spector's Cross-Appeal from the Denial of Prejudgment Interest*

Plaintiff's cross-appeal from the denial of prejudgment interest gives us considerably more trouble. Judge Lumbard, apparently viewing the matter as one within his discretion, denied the award of interest because in his judgment much of the delay in bringing the case to trial was attributable to Spector and because Mermelstein had not realized any profit from his wrongful conduct.

Spector argues that an award of prejudgment interest is mandatory under N.Y.C.P.L.R. § 5001 (McKinney's Consol.Laws, c. 8, 1963) which, both parties agree, governs the right to such interest in this diversity case. See Julien J. Studley, Inc. v. Gulf Oil Corp., 425 F.2d 947 (2d Cir. 1969); Sahley v. McKee, 371 F.2d 720 (2d Cir. 1967); cf. St. Clair v. Eastern Air Lines, Inc., 302 F.2d 477, 480 (2d Cir. 1962); Spanos v. Skouras Theatres Corp., 235 F.Supp. 1 (S.D.N.Y.1964), affd., 364 F.2d 161 (2d Cir.) cert. denied, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966).[7] Section 5001 provides that prejudgment interest is to be awarded in the following actions:

"(a) Actions in which recoverable. Interest *shall be* recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." (Emphasis supplied)

---

6. There is language in Judge Lumbard's opinion which arguably might be construed as placing the burden on Mermelstein to prove that he did not cause the loss of the $250,000. Upon review of the record we believe that Judge Lumbard was merely noting that the evidence sufficiently established the necessary nexus between Mermelstein's conduct and Spector's loss and there was not sufficient evidence, on balance, to outweigh the proof which linked Mermelstein's wrongdoing to the loss.

7. Although the facts which gave rise to the instant suit occurred prior to September 1, 1963, the effective date of the C.P.L.R., the action was not commenced until October 1964 and thus falls within C.P.L.R. § 10003 which makes the C.P.L.R. applicable to "all actions hereafter commenced." See Collier v. Granger, 258 F.Supp. 717 (S.D.N.Y.1966); cf. Morris v. New York Central Railroad, 20 A.D.2d 753, 247 N.Y.S.2d 293 (1964).

"This section, a revision of § 480 of the Civil Practice Act, is New York's latest effort to enforce the policy enunciated by Chief Judge Cardozo in Prager v. New Jersey Fid. & Plate Glass Ins. Co., 245 N.Y. 1, 5–6, 156 N.E. 76, 77, 52 A.L.R. 193 (1927), that 'Interest must be added if we are to make the plaintiff whole.' " Julien J. Studley, Inc., supra, 425 F.2d at 949. Among other changes, the provision modifies prior law by making the award of preverdict interest a matter of right not only on claims for property damage intentionally inflicted but for property damage caused by negligence. The latter had often been viewed as discretionary. See 5 Weinstein-Korn-Miller, New York Civil Practice ¶ 5001.05 (1971); Act, Recommendation and Study Relating to the Allowance of Interest in Actions in Which Compensatory Damages are Awarded for the Violation of Property Rights, Report of the Law Revision Commission for 1950, 95, 99–102. Cf. DeLong Corp. v. Morrison-Knudsen Co., 14 N.Y.2d 346, 251 N.Y.S.2d 657, 200 N.E.2d 557 (1964), where Judge Fuld noted that § 5001 was designed to eliminate distinctions which turned on the nature of the encroachment or of the property interest involved.

Thus § 5001(a) extended the mandatory award of prejudgment interest to negligent invasions of property rights. Here we have an action for money damage in which the harm was to a property interest.[8] See Collier v. Granger, 258 F.Supp. 717 (S.D.N.Y. 1966); Hillsley v. State Bank of Albany, 24 A.D.2d 28, 263 N.Y.S.2d 578 (1965), affd. mem., 18 N.Y.2d 952, 277 N.Y.S.2d 148, 223 N.E.2d 571 (1966). The policy of the section is to facilitate the award of interest and, although there is also a claim of breach of fiduciary duty, "the equity clause should not become a source of sterile controversy over the classification of causes of action." Weinstein-Korn-Miller, supra; ¶ 5001.06 at 50–24.

In Julien J. Studley, Inc., supra, we recognized the mandatory nature of § 5001(a) in a breach of contract action. There the district court judge had denied the plaintiff real estate broker preverdict interest on the ground "that some indeterminable portion of the jury verdict may well be based upon future commissions as yet unearned," and because "as a matter of fundamental fairness" interest should be denied because the defendant did not have use of the money. After finding inadequate support for the first contention, we said that "[i]n any event, the New York statute provides interest as a matter of right in cases of this kind." 425 F.2d at 950. We see no reason for departing from that rule in this case of tortious interference with property rights.

Mermelstein contends that Spector should be estopped from recovering preverdict interest since much of the delay was attributable to him and Mermelstein did not have the use of the money. These factors persuaded Judge Lumbard to deny such interest and if the matter had been within his discretion, we would accept his decision. But § 5001 is mandatory and we have been referred to no case interpreting it to permit exercise of discretion. Mermelstein's reliance on post-judgment cases under C.P.L.R. §§ 5002 and 5003 is misplaced. See, e. g., Ariola v. Petro Trucking Corp., 50 Misc.2d 216, 270 N.Y.S.2d 309 (Sup.Ct. 1966); Feldman v. Brodsky, 12 A.D.2d

---

8. It is doubtful that even that branch of Spector's claim which relied on a breach of a fiduciary duty would be classified for the purposes of § 5001(a) as an "action of an equitable nature." Although fiduciary relationships have equitable underpinnings, here the nature of the relief sought was damages, and no traditional form of equitable relief was sought. Cf. Dobbs, Handbook of the Law of Remedies, § 10.4 at 684 (1973); Frey Realty Co. v. Ten West 46th Street Corp., 1 Misc.2d 371, 145 N.Y.S.2d 670 (Sup.Ct.1955). But cf. Weinstein-Korn-Miller, supra, ¶ 5001.06 at 50–22. This view is buttressed by the failure of the defendant to assert that the action should be deemed equitable and by Judge Wyatt's denial in May 1966 of a motion for a jury trial solely on the grounds of the untimeliness of the motion.

347, 211 N.Y.S.2d 56 (1961), affd. mem., 11 N.Y.2d 692, 225 N.Y.S.2d 762, 180 N.E.2d 915 (Ct.App.1962); Trimboli v. Scarpaci Funeral Home, 37 A.D.2d 386, 326 N.Y.S.2d 227 (1971), affd. mem., 30 N.Y.2d 687, 332 N.Y.S.2d 637, 283 N.E.2d 614 (Ct. of Appl.1972). In post-judgment situations the blame for delay can usually be clearly fixed, e. g., where a judgment creditor refuses tendered sums or the judgment debtor deposits such sums into court. However in pre-judgment situations it would place an extremely difficult burden on the parties and on the court to allocate delay as between the plaintiff, the defendant and the court. Finally, we see no special circumstance in this case. To be sure, Mermelstein has not had use of the money but § 5001(a) is not limited to cases of this sort.

The judgment on the main appeal awarding Spector $250,000 in damages is affirmed. On the cross-appeal we reverse and remand for the assessment of prejudgment interest.