**BESSEMER TRUST COMPANY, N.A., Plaintiff,**

v.

**Francis S. BRANIN, Jr., Defendant.**

**No. 02 Civ. 10276(JES).**

United States District Court, S.D. New York.

April 8, 2008.

Chadbourne & Parke LLP, Donald I. Strauber, Esq., C. Ian Anderson, Esq., Laura M. Jastrem, Esq., Of Counsel, New York, NY, for Plaintiff.

Bond, Schoeneck & King, PLLC, Louis P. Dilorenzo, Esq., Michael I. Bernstein, Esq., Michael P. Collins, Esq., Of Counsel, New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

By Memorandum Opinion & Order, dated April 10, 2006, this Court found defendant, Francis S. Branin, Jr. ("Branin" or "defendant") liable to plaintiff, Bessemer Trust Company, N.A. ("Bessemer" or "plaintiff") for a violation of the rule of law set forth in *Von Bremen v. MacMonnies*, 200 N.Y. 41, 93 N.E. 186 (1910), and *Mohawk Maintenance Co. v. Kessler*, 52 N.Y.2d 276, 437 N.Y.S.2d 646, 419 N.E.2d 324 (1981), which prohibits the impairment of good will which was transferred to a purchaser in connection with the sale of a business. The Court conducted a Bench

Trial on damages from July 24 to July 25, 2007. Having heard and observed all witnesses, considered all the evidence presented, and evaluated the arguments made by the parties' counsel, the Court, for the reasons set forth below, finds defendant liable to plaintiff in the amount of $1,229,173.20. The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## BACKGROUND

The Court assumes familiarity with its Memorandum Opinion & Order, dated April 10, 2006, and will recite here primarily facts related to damages. In that Opinion, the Court stated that Branin's actions left "no doubt in this Court's mind that he improperly induced [the Palmer accounts] in violation of *Von Bremen* and *Mohawk Maintenance*." *See* Mem. Op. & Order, dated April 10, 2006, at 14.

Pursuant to a Purchase Agreement dated August 18, 2000, Bessemer purchased the assets, including client accounts and "good will," of the investment management firm of Brundage, Story and Rose, LLC ("Brundage"), of which defendant was one of several principals/owners. *See* Joint Pre–Trial Order–Damages Hearing, dated April 27, 2007, Ex. A, Joint Statement of Undisputed Facts ("Stip.Facts") ¶¶ 11, 13. The Purchase Agreement reflected that Brundage's total client accounts were worth $4, 130, 150, 780, and that the Palmer family accounts ("Palmer" or "Palmer accounts") were the largest account relationship at $152,000,000. *See id.* 114. As of June 30, 2002, the Palmer accounts had

$117,716,841 in assets under management with Bessemer. *See id.* ¶ 53. Palmer's fee for wealth management services with Bessemer was 30 basis points.[1] *See* Bingham Trial Tr., dated July 24, 2007 ("Tr.") at 117; Mastracchio Tr. at 316. Bessemer and Brundage each hired a firm to place a value on Brundage in connection with the transaction, Cambridge International Partners, Inc. ("Cambridge") and Putnam, Lovell, DeGuardiola & Thornton ("Putnam"), respectively. *See* Stip. Facts ¶¶ 9–10. Cambridge estimated Brundage's value to be approximately $84.5 million; Putnam valued Brundage at approximately $80 million. *See id.* ¶¶ 15–16. Ultimately, Bessemer purchased Brundage for over $75 million. *See id.* ¶ 17.

Brundage had managed the Palmer accounts since the 1930's. *See id.* ¶ 45. Branin began working on the Palmer accounts as the senior partner in 1989. *See id.* ¶ 47. When the former senior partner on the account, Douglas Lane ("Lane"), left Brundage to form his own firm, he unsuccessfully tried to solicit Palmer. *See id.* ¶ 48. Carleton Palmer, the patriarch of the family,[2] explained that he did not follow Lane to his new firm because "he wasn't as comfortable with him" as he was with Branin and because Lane's new firm had no infrastructure. *See id.* ¶ 48. Mr. Palmer testified that Bessemer, by contrast, had "analysis and all the things that you would expect from an investment adviser plus other services." *See id.* ¶ 49. He also testified that the only additional service that Bessemer offered beyond the investment services offered at Brundage

---

**1.** Basis points are essentially the fee that Bessemer charges to its clients. Thirty basis points equates to 0.3% of the client's assets under management. *See* Murtagh Tr. at 92.

Citations to the Trial transcript are preceded by the name of the witness unless the citation is to an attorney or to the Court.

**2.** Mr. Palmer is the "oldest of the current ... senior level of the family." *See* Branin Tr. at 248. Branin testified that Carl Palmer has taken up the role of his father, who was "a very hands-on client." *See id.* at 249.

that he might also be interested in was "trust services" if the representative he worked with at Fifth Third Bank left that entity. *See id.* ¶ 50. Mr. Palmer was satisfied with the services he received from Bessemer. *See id.* ¶ 52.

The wealth management service that Palmer did utilize was provided primarily by Mr. Branin and the "No. 2" on the Palmer account, Paul Barkus ("Barkus"). *See* Barkus Tr. at 5. Around the time Branin left Bessemer, Barkus became the No. 1 on the account. *See id.* at 6. At that time, Barkus' client account management team ("Barkus' team") supervised assets valued at about $1.6 billion, with fees of about $6.7 million, and including about 78 relationships. *See id.* Barkus' team was comprised of himself, two assistants, and a secretary. *See id.* at 7. As of July 2007, Barkus' team managed 70 clients, supervised $3 billion in assets, and generated fees just shy of $13 million. *See id.* At that time, one assistant had left and two had been hired to replace her. *See id.* at 8. Richard Murtagh, the controller of Bessemer, testified that within client account management teams like this one, costs are not allocated to individual client relationships. *See id.* at 59, 61–62. Barkus stated unequivocally that if he had been given the Palmer account when Branin left Bessemer, though it would have been the largest or second largest account managed by Barkus' team, it would not have impacted the team because it "had capacity at the time to take on new accounts, and it wouldn't have been a problem to take on the relationship with the group that [he] had working." *See id.* at 8–9. Mr. Mu-

rtagh agreed that this account would have had no impact on cost. *See* Murtagh Tr. at 62. Barkus further testified that Palmer was "a fairly easy account to manage" because its investment portfolio was fairly narrow, the accounts had fairly similar holdings, the accounts didn't have complicated investments, the Palmers didn't have multiple strategies in their portfolios, it was a fairly conservative account, the clients were terrific, and the clients accepted investment advice "[p]retty much without question...." *See* Barkus Tr. at 9–10, 40, 56. Overall, "from a standpoint of the complexity of the accounts and from the standpoint of the individuals [he] had to deal with, this was one of [his] better accounts." *See id.* at 42.

Defendant, who currently manages the Palmer accounts, strongly disagreed with this assessment of the accounts. *See* Branin Tr. at 247. Branin argued that the Palmer accounts are more difficult to manage because there are 19 accounts and the family members have different risk tolerances, objectives, and preferences. *See id.* at 246. In addition, the Palmers are demanding, interested in their investments, and engaged, and Branin speaks with them at least once a week. *See id.* at 247–48. He agreed that Palmer almost always takes his investment advice, but added that he always wants to know "the why." *See id.* at 250. Though Barkus testified that it is less efficient to administer non-custodied [3] nondiscretionary [4] accounts, he did not agree that it is more difficult to do so. *See* Barkus Tr. at 36–37. The Palmer accounts were discretionary, but not custo-

---

3. In a custodied account, Bessemer holds the physical securities. *See* Barkus Tr. at 26. In a noncustodied account, the assets are held somewhere else and Bessemer interfaces with the custodian to keep records up to date. *See id.*

4. In a discretionary account, the client has given Bessemer the authority to make changes in the accounts without contacting the client first. *See* Barkus Tr. at 27. Palmer's individual accounts were nondiscretionary, but the pension fund account was discretionary. *See id.*

died at Bessemer. *See id.* at 26, 38. Defendant considers these accounts more challenging because of these characteristics. *See* Branin Tr. at 248.

## DISCUSSION

■■■■ This Court held Branin liable for improperly inducing Palmer to leave Bessemer in violation of *Von Bremen* and *Mohawk Maintenance.* *See* Mem. Op. & Order, dated April 10, 2006. Determining damages is a factual inquiry. *See Boyce v. Soundview Tech. Group, Inc.,* 464 F.3d 376, 387 (2d Cir.2006). Under New York law, Bessemer, as prevailing plaintiff, "need only show a 'stable foundation for a reasonable estimate of royalties he would have earned had defendant not breached.'" *See Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir.1977) (quoting *Freund v. Washington Square Press, Inc.,* 34 N.Y.2d 379, 357 N.Y.S.2d 857, 314 N.E.2d 419, 421 (1974)). Damages "'must be not merely speculative, possible, and imaginary, but they

must be *reasonably certain* and such only as actually follow or may follow from the breach of the contract.'"[5] *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 110 (2d Cir.2007) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.,* 101 N.Y. 205, 4 N.E. 264, 266 (1886)). The burden of uncertainty as to the amount of damages falls upon the wrongdoer. *See Tractebel,* 487 F.3d at 110 (quoting *Contemporary Mission,* 557 F.2d at 926).

### A. Lost Profits Theory v. Return of Capital Approach

■■■■ As a preliminary matter, the parties offered two opposing theories of damages. Plaintiff argued for a lost profits theory[6] while defendant argued for a return of capital approach.[7] The Court rejects plaintiff's lost profits theory because it involves "'a multitude of assumptions' that require 'speculation and conjecture.'"[8] *See Schonfeld v. Hilliard,* 218

---

5. Defendant argued that necessarily included in this inquiry is a determination of whether plaintiff has met its "burden of establishing [its] ability to service the needs of [its] customer." *See* Def.'s Post–Tr. Mem. at 17 (citing *Hyde Park Products Corp. v. Maximilian Lerner Corp.,* 65 N.Y.2d 316, 322, 491 N.Y.S.2d 302, 480 N.E.2d 1084 (1985)). Despite testimony from Carleton Palmer suggesting that he would not have remained with Bessemer, Palmer also noted that he was satisfied with the services he received at Bessemer. *See* Stip. Facts ¶ 42. Defendant's suggestion that these services were satisfactory only because defendant was employed at Bessemer at the time requires too great an assumption on the part of the Court. The Court therefore dismisses this argument from the outset.

6. Plaintiff's expert, General Bingham, described this theory as follows: "in essence it's calculating the lost profits that would have been earned and bringing them back to a net present value over a supportable period of loss and summing those numbers and reaching a conclusion." *See* Bingham Tr. at 116.

7. Return of capital is essentially a market value theory.

8. The many assumptions required include the rate of return on the assets under management during the tenure of the Palmer relationship with Bessemer, whether Palmer would have added assets to the portfolio over time, the variable costs of managing the accounts, the discount rate, and the projected length of the Palmer/Bessemer relationship. This last variable is the most significant, as the record is bereft of any factual support as to how long Palmer would have remained with Bessemer absent Branin's inducement.

At the liability stage of the trial, this Court concluded that defendant's conduct played a role, but not the sole role in Palmer leaving Bessemer. *See* Tr. at 231. The Court noted that

one factor, I guess, which is a little bit unique to this particular account is that there was a long history with Palmer with Branin going back pretty far, which ... affects the likelihood that the account might

F.3d 164, 172 (2d Cir.2000) (quoting *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234, 236 (1986)). Instead, the Court follows the very strong guidance from the Second Circuit that market value is the most sensible method of valuing damages and, thus, a return of capital approach is most appropriate. *See Schonfeld,* 218 F.3d at 176 (citations omitted); *Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 826 (2d Cir.1990).

The appropriate measure of damages for wrongful diversion of good will is the loss sustained by reason of the breach, including the loss of profits for plaintiff caused by defendant's acts. *See Borne Chem. Co. v. Dictrow,* 85 A.D.2d 646, 445 N.Y.S.2d 406, 413 (N.Y.App.Div.1981). According to the Second Circuit, the "most accurate and immediate measure of damages is the market value of the asset at the time of breach—not the lost profits that the asset could have produced in the future," in part because this value "reflect[s] the buyer's discount for the fact that the profits [are] uncertain." *See Schonfeld,* 218 F.3d at 176 (citations omitted). Measuring damages in this fashion is "eminently sensible" and takes into account future

lost profits. The "value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce." *See Sharma,* 916 F.2d at 826.

The return of capital theory requires no speculation on the part of the Court as to how long Palmer would have remained with Bessemer or what the attrition rate would have been absent Branin's conduct. Rather, the Court can look to the arms-length transaction through which the parties have already considered every relevant business factor in fixing a price.[9] *See* Tr. at 310. Plaintiff's expert agrees that it is a "very straightforward simple calculation of damages with very few assumptions...."[10] *See* Bingham Tr. at 167.

B. *Assessment of Damages Under the Return of Capital Theory*

Defendant's expert estimated damages under the return of capital theory at $1,519,796, but proceeded to discount this number to take into account the risks peculiar to this one relationship and to deduct the fees received. *See* Mastracchio Tr. at 312, 314. Plaintiff valued damages under this approach at $3.44 million. *See* Bingham Tr. at 109. Both experts based

---

or might not have moved a little sooner than the average. Even assuming that he had done nothing to induce them to leave, given the prior personal relationship ... that's a factor that you can't really calculate. *See id.* at 124–25. Finally, Palmer himself testified that he would have left Bessemer even without the urging of Branin. *See* Deposition of Carleton P. Palmer, dated June 28, 2007, at 11 ("If Mr. Branin had ... ceased to work in the wealth management business ... would the Palmer accounts have remained at Bessemer? No.").

9. Since this Court does not have the benefit of an assessment of market value at the time Branin induced Palmer to leave Bessemer, it uses the market value at the time of purchase. The Court draws the reasonable inference

that market value would not have changed substantially in the two years between the purchase and the breach.

10. Plaintiff's expert also acknowledged the following as a passage from an authoritative text with respect to business valuation:

[T]he sum total of combined loss profits and any decrease in overall business value is limited to the interest value of total future profits anticipated by the business prior to the alleged damaging acts. The reason is that interest value of any business is the present (discounted) value of all expected future profits. Intuitively this should serve as a recurring reasonableness check throughout the calculation process.

*See* Bingham Tr. at 195–96.

these estimates on the price of the business multiplied by the percentage of Brundage that represented the Palmer accounts.

Since an arms-length transaction is the best evidence of fair market value, *see Boyce*, 464 F.3d at 387; *Schonfeld*, 218 F.3d at 179, the Court finds that the actual purchase price is the most appropriate reflection of Brundage's value. Plaintiff's expert incorporated the valuations of the business by Cambridge and Putnam (the valuation experts hired by Brundage and Bessemer during the purchase), the actual purchase price, and a value determined by Putnam that the purchaser would have been willing to pay and that they would have earned absent Branin's illegal activities. *See* Bingham Tr. at 108–10, 112. However, the Court agrees with defendant that Bessemer didn't invest more than it paid even if Brundage was worth more than the purchase price. *See* Tr. at 111. Therefore, the Court will assess damages under the return of capital theory using a $75 million [11] purchase price for Brundage.

Next the Court must determine what the purchase price would have been if Bessemer had only purchased the Palmer accounts. The Court draws the reasonable inference that the fees that Palmer was expected to generate as a percentage of the total expected fee generation reflects the portion of Brundage's value attributable to the Palmer accounts. Plaintiff's expert instead took the total assets under management at Brundage and the Palmer assets under management at various dates and calculated the Palmer percentage.[12] *See* Bingham Tr. at 106–07, 164–65. Arguing that assets under management "are not all created equal," *see* Mastracchio Tr. at 299, defendant's expert based the Palmer percentage on the estimated fees generated by the Palmer accounts as a percentage of the estimated fees generated by all of the Brundage accounts. *See id.* at 297. Defendant noted that the Palmer accounts were charged only 30 basis points, and so, "when they were anticipating the sale they were expecting the generation of $21 million worth of fees and they expected Palmer to generate $152,000" of those fees. *See id.* at 297. This leads to a Palmer percentage of 2.09%. *See id.* at 300. For purposes of evaluating a business, this latter approach is the most sensible, as the present value of any business reflects the anticipated revenue stream because "the future earnings from that business are obviously the most significant factor in interpreting what it's worth now." *See* Tr. at 201–02. Even plaintiff's expert conceded that the "vast majority" of the reflection of value in the cost of the business was "almost entirely the stream of future income...." *See* Bingham Tr. at 162. Applying the 2.09% Palmer percentage to the roughly $75 million purchase price produces a preliminary damages figure of $1,579,796.10.

This figure must be discounted to account for the fees paid to Bessemer during

---

11. The post-trial briefs submitted by plaintiff and defendant reflect an exact purchase price of $75,588,333. *See* Bessemer Trust Co., N.A.'s Post–Trial Mem. on Damages ("Pl.'s Post–Trial Mem.") at 21; Def.'s Post–Trial Mem. (Damages Trial) ("Def.'s Post–Trial Mem.") at 11, fn. 8.

12. Plaintiff argued that this is the most appropriate method of gauging the significance of the Palmer accounts to Bessemer as the Purchase Agreement listed the top twenty-five clients being acquired by assets under management, not fees generated. *See* Pl.'s Post–Trial Mem. at 23. Though the understanding of the parties is compelling, the Court cannot ignore the fact, which plaintiff's expert concedes, that the purchase of a business involves primarily the purchase of the future stream of income.

Palmer's tenure there.[13] *See Bausch & Lomb, Inc. v. Bressler,* 977 F.2d 720, 729–30 (2d Cir.1992)(awarding damages under a restitutionary theory which allows recovery of the reasonable value of property conveyed less the reasonable value of any counterperformance received); Tr. at 188–89, 275. Defendant also argued that plaintiff's damages should be offset by interest earned on these fees. *See id.* at 24. Defendant suggested, and the Court agrees, that interest should be added to the purchase price paid to Branin before subtracting Bessemer's earned fees with added interest. *See* Def. Francis S. Branin's Supplemental Post–Trial Mem. at 5. Based on defendant's suggested fair market rate of 5% simple interest on the purchase price paid to Branin and the estimated fees received by Bessemer, the fee offset totals $915, 390.[14] The preliminary damages figure is $826,335.

■ Defendant still objected to utilizing a straightforward return of capital approach, as he argued it does not account for the risk of Palmer leaving Bessemer. *See* Def.'s Post–Trial Mem. at 11, 23–24. This risk, though unique to the Palmer accounts as evidenced by Palmer's testimony, must be born by the wrongdoer. *See*

*Contemporary Mission,* 557 F.2d at 926. Therefore, the Court rejects defendant's suggestion that it consider this unquantifiable factor.

### C. *Prejudgment Interest*

■ In diversity actions like the case at bar, the awarding of prejudgment interest is a substantive issue, and so, is governed by state law. *See Schwimmer v. Allstate Ins. Co.,* 176 F.3d 648, 650 (2d Cir.1999). New York state law requires that "interest shall be recovered upon a sum awarded because of a breach of performance on a contract." *See* N.Y. Civ. Prac. L. & R. 5001(a) (McKinney 1992). A cause of action for wrongful diversion of good will in connection with the sale of a business "sounds in breach of an implied covenant of the contract of sale." *See Borne,* 445 N.Y.S.2d at 413. This prejudgment interest is recoverable as of right in an action at law. *See Trademark Research,* 995 F.2d at 342 (citation omitted); *Wechsler v. Hunt Health Sys.,* 330 F.Supp.2d 383, 434 (S.D.N.Y.2004). New York law requires that this interest shall be 9% unless otherwise provided by statute.[15] *See* N.Y. Civ. Prac. L. & R. 5004.

---

**13.** Bessemer paid a fixed price for a stream of income and thereafter received the benefit of that stream of income for a period of two years. In calculating damages, the Court cannot ignore this benefit received by plaintiff.

Defendant estimates these fees at $456,000 for the first year and $393,000 for the second by taking the assets under management ($152 million) at the time of acquisition for year one and the midpoint between the assets under management at acquisition and the assets under management at Palmer's departure ($110 million) for year two and applying a fee of 30 basis points. *See* Def.'s Post–Trial Mem. at 24 & fn. 16.

**14.** First, 5% compound interest was applied to the $1.579 million purchase price during the period from November 2000 to October

2002 to result in a total of $1,741,725. The fees from the first year at Bessemer (roughly August 2000 to July 2001) were $456,000, Fees were paid each November for the upcoming year. *See* Branin Tr. at 274, 276–77. Applying 5% compound interest from November 2000 to October 2002 results in a total of $502,740. Applying 5% simple interest to the $393,000 in fees from the second year (November 2001 to October 2002) results in a total of $412,650. To reach the total for fee offsets, the first and second years' fees were added to the estimated interest earned on those fees to result in an offset of $915,390.

**15.** Courts must apply the statutory rate of interest except "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." *See* N.Y. Civ. Prac. L. &

Prejudgment interest on the damages figure of $826,335 amounts to $402, 838.22.[16]

## CONCLUSION

For the reasons stated above, this Court hereby finds that defendant is liable to plaintiff in the amount of $1,229,173.20. The Clerk of Court shall terminate all motions pending as of April 10, 2008 as moot and close the case.

It is SO ORDERED.

R. 5001(a). The Second Circuit warns against making this equity exception a "sterile source of controversy over the classification of causes of action." *See Spector v. Mermelstein*, 485 F.2d 474, 482 (2d. Cir.1973) (citation omitted). Even in actions of an equitable nature that are based on contract, the trend has been to award prejudgment interest as of right. *See In re Estate of Kummer*, 93 A.D.2d 135, 461 N.Y.S.2d 845, 874 (N.Y.App.Div. 1983) (citation omitted). Regardless, the implied covenant not to impair the good will of the business is not equitable, but is "imposed by law in order to prevent the seller from taking back that which he has purported to sell." *See Sager Spuck Statewide Supply Co. v. Meyer*, 273 A.D.2d 745, 710 N.Y.S.2d 429, 432 (N.Y.App.Div.2000) (quoting *Mohawk Maintenance*, 437 N.Y.S.2d 646, 419 N.E.2d at 329). Since this cause of action is legal in nature, the statutory rate of interest is binding on this Court.

16. Though the actual date of breach was in June 2002, since the fees were paid on a yearly basis, plaintiff would not have felt the financial impact of the breach until November 2002, when the otherwise expected fees would have been paid. Therefore, the Court calculates prejudgment interest beginning in October 2002, resulting in a period of 65 months.