In the Matter of the Estate of PHILIP KUMMER, Deceased. MARGARET KUMMER, as Temporary Administratrix of the Estate of PHILIP KUMMER, Deceased, Appellant-Respondent; DEPARTMENT OF SOCIAL SERVICES OF THE COUNTY OF WESTCHESTER, Respondent-Appellant; CLIFFORD J. KUMMER et al., Respondents.

Second Department, April 4, 1983

APPEARANCES OF COUNSEL

*Frank & Fredericks* (*Frank O. Fredericks* and *David B. Julie* of counsel), for appellant-respondent.

*Samuel S. Yasgur, County Attorney* (*Jonathan Lovett* and *Eric D. Koster* of counsel), for respondent-appellant.

*Samuel N. Barish,* guardian ad litem, for Clifford and Jennifer Kummer, respondents.

## OPINION OF THE COURT

DAMIANI, J. P.

These are cross appeals from stated portions of a decree of the Surrogate of Westchester County in a proceeding to settle the intermediate account of the administratrix of the decedent. At issue is whether certain moneys advanced by the Westchester County Department of Social Services for the medical and nonmedical care of the decedent's children before his death, may be recovered from decedent's estate and whether, and to what extent, any recovery should bear predecision interest. We must begin with a knowledge of the people whose actions gave rise to the present dispute and of the different roles they play.

DRAMATIS PERSONAE

*Clifford and Jennifer Kummer* — the children of Daisy and Philip Kummer. They were placed in the care of the Westchester County Department of Social Services as neglected children by order of the Family Court and were subsequently placed in a foster home.

*Daisy Kummer* — the mother of Clifford and Jennifer and first wife of Philip Kummer. She is now deceased.

*Philip Kummer* — the testator and the father of Clifford and Jennifer. After the death of Daisy, he married Margaret Kummer. He is now deceased.

*Margaret Kummer* — the second wife of Philip Kummer and administratrix of his estate. She is the petitioner in this proceeding to obtain a judicial settlement of an intermediate account of Philip Kummer's estate.

*The Department of Social Services of the County of Westchester* (hereinafter DSS) — this party plays several different roles in this case. First, the DSS was the custodian of the persons of the two children, Clifford and Jennifer, by reason of an order of placement of the Family Court giving the DSS custody due to the neglect of their parents. Second, the DSS is the "representative payee" of certain Social Security benefits due from the Federal Government to the children. Third, the DSS is a welfare agency, that is, it administers certain relief programs providing for monetary payments to the needy. Fourth, the DSS is the objectant in this proceeding, that is, it objects to the rejection by the administratrix of its claim for reimbursement of moneys expended for the care of the children.

THE FACTS

Daisy and Philip Kummer were married and had two children, Clifford and Jennifer. On July 24, 1972 the DSS instituted a neglect proceeding against the parents pursuant to article 10 of the Family Court Act and the children were removed from their parents' custody on that date. Four days later, on July 28, 1972 the mother, Daisy Kummer, died. She left an estate exceeding half a million dollars to her husband Philip Kummer.

On April 12, 1973 an order was entered in the pending Family Court neglect proceeding pursuant to a stipulation of the parties which, *inter alia,* (1) found neglect on the part of the father, Philip Kummer, (2) placed the children with the DSS, which would, in turn, place them in a foster home, with the provision that the father would not be advised of their residence, (3) provided that the father would have the right at any time to bring a petition to terminate the placement and (4) granted a permanent order of protection

directing the father not to harass the children or attempt to contact them in any way except through the DSS.

In June, 1973 the DSS wrote to the father concerning an oral undertaking that he had apparently made "to pay for the full cost of care from the date of placement" of the children. Thereafter, letters were exchanged in August and November, 1973 concerning the father's support obligation. In the letter of August 14, 1973, the DSS queried the father concerning the deceased mother's Social Security status, stating: "We also need to know Mrs. Kummer's Social Security number to determine if the children are eligible to receive any benefits based on Mrs. Kummer's account. If you are already in receipt of Social Security Benefits, then the County will effect a change of beneficiary *and you would be responsible for the difference between Social Security and the full cost [of care]*" (emphasis added). In the letter dated November 26, 1973 the DSS again told the father that "[w]hen we become beneficiary of the social security benefits on the account of Mrs. Kummer * * * you will only be responsible for the difference between social security benefits and the full cost of care".

Philip Kummer paid $6,059.12 to the DSS toward the care and maintenance of the children from 1973 to 1974. On or about June 11, 1974 the DSS commenced a support proceeding against the father in the Family Court, Westchester County, alleging that since July 26, 1972 he had neglected to provide for the support of the children and that the DSS had authorized public assistance for the children in the sum of $610.40 per month plus medical expenses for their support. The petition was filed before the children had been awarded any Social Security benefits (to be discussed shortly, *infra*) and it thus appears that in the hiatus between the removal of the children from their parents and payment of Social Security benefits to which they were entitled, the DSS acted in its role as a welfare agency (see *dramatis personae, supra*) to provide relief for them on the ground that they were needy.

Daisy Kummer was a currently insured member of the Social Security system and when she died her children became entitled to benefits from the Federal Old-Age, Survivors, and Disability Insurance Trust Fund (OASDI)

as her dependents (see US Code, tit 42, § 402, subd [d]). The payments from the fund are not a form of public assistance administered by the DSS. Rather, they are akin to an annuity, purchased by Social Security contributions of the wage earner, which is payable to his or her dependent children until they reach age 18.

On August 3, 1974 the DSS applied, pursuant to subdivision (j) of section 405 of title 42 of the United States Code, for appointment by the Social Security Administration as "representative payee" to receive the OASDI benefits to which the children were entitled.[1] On October 22, 1974 the DSS was appointed "representative payee". It is important to note here that the OASDI benefits were the property of the children and that the DSS applied for and received the designation of representative payee in its role as the custodian of the persons of the children (see *dramatis personae, supra*) and *not* in its role as a welfare agency. Thus, DSS was to receive and apply the OASDI funds for the use and benefit of the children (see 20 CFR former 404.1601).

The rules governing the expenditure and conservation of OASDI funds received by a "representative payee" were contained in two regulations promulgated by the Social Security Administration, which stated in relevant part:

"[Former] § 404.1604 Use of benefits for current maintenance

"Payments certified to a relative or other person on behalf of a beneficiary shall be considered as having been applied for the use and benefit of the beneficiary when they are used for the beneficiary's current maintenance — i.e., to replace current income lost because of the disability, retirement, or death of the insured individual.

"[Former] § 404.1605 Conservation and investment of payments

*"Payments certified to a relative or other person on behalf of a beneficiary which are not needed for the current maintenance of the beneficiary * * * shall be conserved or invested on the beneficiary's behalf.* Preferred investments are U.S.

---

1. At the time the underlying events of this case transpired, the regulations of the Social Security Administration governing the appointment and duties of representative payees were contained in 20 CFR former 404.1601 through former 404.1610. Those regulations were recently extensively revised and renumbered as 20 CFR 404.2001 through 404.2065 (see 47 Fed Reg, pp 30468-30474, 32936, 34781, eff July 14, 1982).

Savings Bonds, but such funds may also be invested in accordance with the rules applicable to investment of trust estates by trustees. For example, surplus funds may be deposited in an interest or dividend bearing account in a bank or trust company or in a savings and loan association if the account is either Federally insured or is otherwise insured in accordance with State law requirements. Surplus funds deposited in an interest or dividend bearing account in a bank or trust company or in a savings and loan association must be in a form of account which clearly shows that *the representative payee has only a fiduciary, and not a personal, interest in the funds*" (emphasis added).

The DSS received a total of $17,527.20 in OASDI benefits for the period from May, 1973 through July, 1976 (Philip Kummer died on July 24, 1976), half of which sum was attributable to each child.

It was not until December 29, 1975 that the support proceeding, commenced in June, 1974, was heard in the Family Court, Westchester County. In the meantime the DSS had begun to receive the children's Social Security benefits. It agreed with the father to settle the support proceeding and a stipulation was entered into upon the following terms: (1) the father would turn over to the DSS two $10,000 Arizona Public Service Company bonds which were in his possession and which were registered in the name of Daisy Kummer as custodian for each of the two children under the New York Uniform Gifts to Minors Act (EPTL 7-4.1 *et seq.*) (2) the DSS would cash the bonds and apply the principal and accrued interest thereon to the payment of the cost of past and future care for the children, including medical expenses until such time as the fund was depleted or the placement with the DSS terminated, (3) the proceeds of both bonds could be commingled for the benefit of both children, (4) if the placement were terminated before the fund was fully expended, the DSS would pay the balance to the father, (5) the proceeds would be placed in an interest-bearing bank account and (6) in consideration of the foregoing, the DSS agreed to withdraw "the petition in the instant proceeding *without prejudice*" (emphasis added).

It appears that the DSS received the bonds from the father and tried to surrender them, but the agent bank required certain documents which the DSS could not or would not produce and therefore as of the time this proceeding was heard it retained the bonds uncashed. On July 24, 1976 Philip Kummer died.

Between July 24, 1972, when the children were removed from the custody of their parents, and that same date four years later, when Philip Kummer died, the DSS disbursed $18,807.04 for the care of the two children, exclusive of medical assistance. During that period it also spent $9,044.59 for medical assistance pursuant to title XIX of the Federal Social Security Act (US Code, tit 42, § 1396 *et seq.*), commonly known as "Medicaid". In that period it received $17,527.20 in OASDI benefits for the children, $6,059.12 from their father. Philip Kummer and the two $10,000 bonds.

On January 3, 1977 the DSS filed a claim against the father's estate in the sum of $5,046.32 for reimbursement of care and assistance allegedly given the children under State law. On April 1, 1977 the DSS served an amended claim for $22,292.32. The main difference in the two claims apparently was that at first the DSS had subtracted both the father's contributions and the OASDI benefits from its gross expenditures in order to calculate the net sum allegedly due from the father's estate, whereas under the amended claim, it had not subtracted the OASDI benefits from its expenditures.

The DSS claims were rejected by the administratrix upon the ground that the support proceeding it had commenced against the decedent during his lifetime had been settled by the stipulation recounted previously, in which the DSS had promised to cash the two $10,000 bonds and to use the principal and accrued interest thereon to pay for the cost of care for the two children. Since the DSS had not cashed in the bonds, reasoned the administratrix, it was not entitled to further moneys from the estate.

The administratrix commenced this proceeding to obtain a judicial settlement of an intermediate account of the estate. The propriety of the rejection of the DSS claim was one of the issues raised. That issue came on before Surro-

gate Brewster on September 17, 1979. At that time, pursuant to a notice to admit, the parties stipulated to most of the foregoing facts. Most importantly, it was stipulated by the administratrix that at all times between July 24, 1972 and July 24, 1976 Philip Kummer had sufficient resources, within the meaning of relevant statutes and regulations, to pay for "all care and assistance" rendered to the children, including medical assistance. No part of the children's OASDI benefits were applied to medical assistance furnished to them by the DSS.

On June 12, 1980, Surrogate Brewster rendered an opinion concerning the claim of the DSS (*Matter of Kummer,* 104 Misc 2d 978), which may be summarized as follows:

(1) a parent is primarily responsible for the support of his or her children, irrespective of the fact that the children may have independent means of their own;

(2) where support is not provided by the parent, the DSS is required to provide public assistance (Social Services Law, art 6, tit 2, § 395 *et seq.*), and to compel a person liable for support of the children cared for at public expense to repay the sums expended on their care;

(3) the DSS could recover the amounts it expended for nonmedical care from the estate of the responsible relative (Social Services Law, §§ 101, 104);

(4) there was no justification for the DSS to expend the children's OASDI benefits for their care when the father had inherited some $500,000 from his first wife and was always financially able to pay for their support. It was against the best interests of the children to use their OASDI funds in that manner;

(5) the stipulation settling the support proceeding commenced by the DSS against the father during his lifetime was no bar to recovery after his death because (a) the proceeding was withdrawn "without prejudice" and (b) since the bonds were the property of the children, the father gave no consideration for the settlement when he surrendered what was not his property;

(6) the DSS could not recover for medical expenses because "[t]here is no statutory authority at present for

recovery from the estate of a responsible relative for medical assistance (MA) furnished to infant children" (104 Misc 2d 978, 984, *supra*);

(7) the DSS could recover the amount paid for the care of the children less the payments made by their father during his lifetime with 6% interest from the date of the father's death; and

(8) the DSS was directed to repay the full $17,527.20 in OASDI benefits to the accounts of the children with 3% interest per annum until repaid.

THE LAW

There are three contenders in this case: the widow-administratrix, the children, and the DSS. They have filed five briefs containing 22 points, resulting in a confusing welter of conflicting claims and arguments which can best be understood upon a short review of the apparent motivations of the parties. This case concerns money. Each of the parties is seeking to maximize the amount of money he, she or it will receive from the decedent's estate and will keep for him, her or itself.

The decedent's will is in the original papers. It directs that his debts be paid from his estate and then, *inter alia,* divides the residuary into four parts. Two of those parts (or half the residuary estate), are left absolutely to his widow, the administratrix here. The remaining two parts are left in trust for Clifford and Jennifer until such time as they reach 30 years of age.

The importance of the will is that to the extent that the unfulfilled obligation of the decedent to support his children Jennifer and Clifford constitutes a debt, payment of that debt will reduce the residuary estate and thereby diminish the share left to the administratrix absolutely. Accordingly, she argues that the estate is not responsible either for medical or nonmedical care furnished to the children. On the other hand the children are seeking to maximize the amount they will receive outright while at the same time are opposing payment of any claims that will not ultimately be made to them because such claims would reduce the residuary and thus the amount they

receive in trust. Accordingly, they contend that the cost of nonmedical care is recoverable by the DSS and that it was properly directed to repay them the OASDI benefits used by it to cover the cost of that care. However, they oppose reimbursement of the medical claim to DSS because they would not ultimately receive those moneys and their trust legacy would be reduced by the reimbursement. The DSS claims that it is entitled to reimbursement of the expenses of both medical and nonmedical care from the estate and it further claims that the court erred in directing it to repay the OASDI benefits of the children which it previously applied to the cost of their nonmedical care, a contention, which, if accepted, would give it a profit of approximately $12,000 arising from its care of the children.

The numerous points in the briefs all relate to three disputed issues, viz.: (1) whether the DSS could recoup the cost of *nonmedical care* from the father's estate and whether the DSS was properly directed to return to the children the OASDI benefits which it used to pay for that care, (2) whether the DSS could rightfully recoup the cost of *medical care* from the estate, and (3) whether predecision *interest* is payable on any recovery.

I NONMEDICAL CARE

Discussion of this question must first proceed with a discussion of a parent's duty to support children. At one time the primary duty of support was on the father and only if he was dead or incapacitated did the duty of support devolve upon the mother (Family Ct Act, former §§ 413, 414). In *Matter of Carter v Carter* (58 AD2d 438) this court read those statutes as though they were "gender neutral" so as to preserve their constitutionality. They have since been amended to expressly provide that the duty of support rests equally on both parents (Family Ct Act, § 413, as amd by L 1980, ch 281, §§ 28, 29). Most of the cases in this area were decided prior to *Carter* and the 1980 amendment of the statute. They should now be read as though, when they were decided, the duty of support rested equally on both parents.

After the death of one of the parents, the duty rests upon the survivor (cf. *Matter of Slochowsky v Lavine,* 73 Misc 2d

563; *Matter of Garcy,* 19 AD2d 811) to support the children not only in accordance with their needs but also in accordance with that surviving parent's means (cf. *Matter of Delli Veneri v Delli Veneri,* 40 AD2d 735). In the instant case an attorney for the administratrix stipulated that from the time the children were taken into custody of the DSS until the father's death he had sufficient financial ability to pay "any of the expenses of the children". ·

The general rule is that a parent has the obligation to support the children even though they have resources of their own (cf. *Matter of Quat v Freed,* 25 NY2d 645; *Drazin v Drazin,* 31 AD2d 531; *Siegel v Hodges,* 15 AD2d 571). Logically, if a surviving parent lacks the means to fully pay for the support of his or her children, then the separate estate of the children should bear some of the burden of their support. This, however, is not such a case because here the administratrix conceded the father's ability to fully pay for their support.

We must now discuss the role of the DSS as "representative payee" of the OASDI benefits due to the children by reason of the mother's death. In that role the DSS was a trustee of the OASDI funds and was obliged to apply them in accordance with the regulations of the Social Security Administration quoted above, namely, that they be used to pay for the beneficiaries' current maintenance so as to replace current income lost because of the death of the mother (see 20 CFR former 404.1604) and, *if not needed* for current maintenance, to invest the funds or deposit them in interest-bearing bank accounts (see 20 CFR former 404.1605).

If we were to assume for the moment that someone other than the DSS had been named as representative payee of the OASDI benefits due the children and that the DSS, as the custodian of their persons, asked that independent representative payee to expend the benefits to cover the cost of the maintenance of the children, what should the independent payee have answered? Based upon the foregoing discussion of the duty of support and the stipulation of the parties that the father had the means to pay all necessary expenses of the children, a responsible independent representative payee would have refused the request

by the DSS, suggesting that it first seek payment from the father.

The administratrix claims that pursuant to our law, however, the OASDI payments had to be considered in calculating the full amount of support due the children from the father, citing *Carole K v Arnold K* (85 Misc 2d 643, 648, mod on other grounds 87 Misc 2d 547). In that case the mother was disabled and the children were receiving OASDI benefits because of that disability. The husband was insolvent and the question was whether he should decrease his payments to his other creditors so as to pay more to the children. The court held that both parties were liable for the support of the children and that in calculating the amount that the husband was obligated to pay, the monthly insurance payment made to the children because of the wife's disability "must be taken into account, since it is received as a matter of statutory right specifically for their support needs" (p 648). The *Carole K* case is therefore clearly distinguishable because in that case the father was not fully able to pay the support himself, whereas here it is conceded that he was fully able to make such payments. Thus it is our conclusion that an independent representative payee should properly have refused to use the OASDI benefits for current maintenance since they were "not needed" for that purpose in light of the father's complete ability to pay.

■ One of the problems in this case is that the DSS wore many different hats. Rather than expend public moneys on the care of the children until such time as the father could be made to pay, the DSS, wearing its "welfare" hat, asked itself, wearing its "representative payee" hat, to use the OASDI funds for maintenance. The DSS improperly used the money of the children which it held in trust to pay the costs of maintenance which should have been covered by welfare funds until such time as the father could be made to pay. To this point then, we are in full accord with Surrogate BREWSTER that the actions of the DSS concerning the use of OASDI funds to pay for nonmedical care were improper. The next question is whether the relief he granted was appropriate and authorized by law.

The claim against the husband's estate was made by the DSS, on its own behalf, for "assistance * * * actually furnished" to the children and was expressly said to be based upon a liability arising against the estate of the deceased under sections 101, 104 and 369 of the Social Services Law. Section 369 deals with medical assistance and will be discussed *infra*.

Section 398 (subd 2, par [b]) of the Social Services Law provides that a "welfare officer" shall have the power and duty to "[r]eceive and care for any * * * neglected * * * child placed or discharged to his care by the family court". In such event the official is then obligated to "[a]scertain the financial ability of the parents of children who become public charges and collect toward the expense of such child's care such sum as the parents are able to pay" (Social Services Law, § 398, subd 6, par [d]). Where the parents refuse to pay voluntarily, section 101, under which the instant claim was made, provided at the time the facts of this case transpired:

"§ 101. Liability of relatives to support

"1. The spouse or parent of a recipient of public assistance or care or of a person liable to become in need thereof shall, if of sufficient ability, be responsible for the support of such person, provided that a parent shall be responsible only for the support of a child under the age of twenty-one years. Step-parents shall in like manner be responsible for the support of step-children under the age of twenty-one years.

"2. The liability imposed by this section shall be for the benefit of the public welfare district concerned or any legally incorporated non-profit institution which receives payments from any governmental agency for the care of medically indigent persons, and *such liability may be enforced by appropriate proceedings and actions in a court of competent jurisdiction.* Such proceedings and actions may be brought by such an institution in any court wherein a similar proceeding or action could be brought by a public welfare official" (emphasis added).

Section 104, under which the claim was also brought, provides:

"§ 104. Recovery from a person discovered to have property

"1. A public welfare official may bring action or proceeding against a person discovered to have real or personal property, or against the estate or the executors, administrators and successors in interest of a person who dies leaving real or personal property, if such person, or any one for whose support he is or was liable, received assistance and care during the preceding ten years, and shall be entitled to recover up to the value of such property the cost of such assistance or care. Any public assistance or care received by such person shall constitute an implied contract. No claim of a public welfare official against the estate or the executors, administrators and successors in interest of a person who dies leaving real or personal property, shall be barred or defeated, in whole or in part, by any lack of sufficiency of ability on the part of such person during the period assistance and care were received.

"Nor shall the claim asserted by a public welfare official against any person under this section be impaired, impeded, barred or defeated, in whole or in part, on the grounds that another person or persons may also have been liable to contribute.

"In all claims of the public welfare official made under this section the public welfare official shall be deemed a preferred creditor.

"2. No right of action shall accrue against a person under twenty-one years of age by reason of the assistance or care granted to him unless at the time it was granted the person was possessed of money and property in excess of his reasonable requirements, taking into account his maintenance, education, medical care and any other factors applicable to his condition."

The essential prerequisite for reimbursement under sections 101 and 104 is that the DSS must have provided "assistance or care" to the child in question. That is, the DSS must have out-of-pocket expenses before it can recover reimbursement against a parent or the parent's estate. Here there has been a failure to prove unreimbursed out-of-pocket expenses.

When the children were first taken into DSS custody, it expended public assistance funds for their care before it was in receipt of the OASDI benefits or the $6,059.12 paid to it by the father. The DSS has failed to prove that its out-of-pocket welfare moneys exceeded the amount paid by the father during his lifetime. Rather, it appears that the father's payments fully reimbursed the DSS for its expenses and that thereafter the DSS improperly used the OASDI benefits to cover the current needs of the children.

The crux upon which the claim by the DSS for reimbursement of nonmedical care expenses turns is that it is not "out-of-pocket" for those expenses. The Surrogate adopted a rather ingenious stratagem for making the DSS incur out-of-pocket expenses. He directed it to repay the entire sum of the OASDI benefits to the account of the children. That reimbursement would have to be made with public moneys, the DSS would then have out-of-pocket expenses, and it could then recover those expenses from the father's estate.

Both the administratrix and the DSS have combined to argue that the Surrogate lacked the power to order the DSS to reimburse the OASDI funds. This argument is raised by the administratrix to establish that the court cannot compel the DSS to make out-of-pocket expenditures. The DSS on the other hand, ignores the out-of-pocket problem. It argues the patently inconsistent points that the estate is liable to it but that it is not liable to the children. Whatever their motivations, the administratrix and the DSS have argued that the Surrogate lacked the power to direct repayment of the OASDI funds by the DSS to the account of the children. We disagree.

The argument that the Surrogate erred in determining the question of whether the DSS, as representative payee, misapplied the OASDI funds encompasses the following points: *first,* it is claimed that the propriety of expenditures of OASDI funds by a representative payee is reserved by Federal law to administrative proceedings before the Social Security Administration and is reviewable thereafter solely in the Federal courts, and accordingly all the courts of this State lack subject matter jurisdiction over that question; *second,* it is argued that the Social Security Act

does not in any case create a private cause of action to recover misapplied OASDI benefits from a representative payee, and, by implication, that there is no cause of action known to the law which would authorize their recovery; *third,* it is argued that if the State courts have not been ousted from jurisdiction, and if there is a cause of action to recover such misapplied benefits, the proper forum for considering that cause of action between the children and the DSS is in the Supreme Court which has general jurisdiction and not the Surrogate's Court, which has only limited jurisdiction over the instant estate proceeding; and *fourth,* it is claimed that if the Surrogate had subject matter jurisdiction he could not exercise it *sua sponte,* without a pleading by the children requesting relief. For the following reasons we hold that the Surrogate had jurisdiction over the subject matter and the parties and that he had the right to exercise his power *sua sponte.* However, his discretion to do so was improvidently exercised in the case at bar, which deals only with the intermediate and not the final account.

The first of the foregoing arguments is that only the Federal and not the State courts have jurisdiction over claims of misapplication of OASDI funds by a representative payee. OASDI is a Federal program governed by the regulations of the Social Security Administration (20 CFR) which, at the time the underlying events of this case transpired, provided in relevant part:

"[Former] § 404.1603 Responsibility of representative payee

"A relative or other person to whom certification of payment is made on behalf of a beneficiary as representative payee shall, *subject to review by the Administration* and to such requirements as it may from time to time prescribe, apply the payments certified to him on behalf of a beneficiary only for the use and benefit of such beneficiary in the manner and for the purposes determined by him to be in the beneficiary's best interest" (emphasis added).

"[Former] § 404.1609 Accountability

"A relative or other person to whom payments are certified as representative payee on behalf of a beneficiary *shall*

*submit a written report in such form and at such times as the Administration may require, accounting for the payments certified to him on behalf of the beneficiary* unless such payee is a court-appointed fiduciary and, as such, is required to make an annual accounting to the court, in which case a true copy of each such account filed with the court may be submitted in lieu of the accounting form prescribed by the Administration. If any such relative or other person fails to submit the required accounting within a reasonable period of time after it is requested, no further payments shall be certified to him on behalf of the beneficiary unless for good cause shown, the default of such relative or other person is excused by the Administration, and the required accounting is thereafter submitted" (emphasis added).

The administratrix argues that the duty to account created by these regulations is for the benefit of the beneficiary and that if the representative payee has misapplied the funds, the beneficiary can seek to have the Social Security Administration issue an administrative directive for him to refund those sums improperly applied, which directive is reviewable only in the Federal courts pursuant to subdivision (g) of section 405 of title 42 of the United States Code.

Under the provisions of section 405 of title 42 of the United States Code, the Social Security Administration is "directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter [US Code, tit 42, ch 7, subch II covering OASDI benefits]", and is granted the authority to make rules and regulations and establish procedures necessary or appropriate to carry out such duties (US Code, tit 42, § 405, subds [a], [b]). Pursuant to that authority, regulations were promulgated (20 CFR 404.900 *et seq.*). Basically the regulations provide for two types of administrative action, namely those that are "initial determinations" and those that are not initial determinations. As to initial determinations, an applicant is entitled to reconsideration and a hearing (20 CFR 404.900, 404.901, 404.907, 404.929, 404.930), to have the determination made after the hearing subjected to an administrative appeal process (20 CFR

404.967 *et seq.*) and to judicial review in the Federal courts (US Code, tit 42, § 405, subd [g]). Those actions of the Social Security Administration which are not initial determinations may be reviewed by the administration but are not subject to reconsideration at a formal hearing, to administrative appeal, or to judicial review (see 20 CFR 404.903).

Initial determinations include, *inter alia,* the questions of an applicant's entitlement to benefits, the amount of the payment, termination of benefits, the establishment of the period of disability, the need for payment to a representative payee on behalf of a beneficiary who is 18 years of age or older and who has not been declared legally incompetent, and who will act as representative payee if the Social Security Administration determines that representative payment will be made (20 CFR 404.902). Noninitial determinations include the denial of a request to be made a representative payee (20 CFR 404.903[c]). The essence of this plan is that questions which are properly the subject of administrative action by the Social Security Administration are either relegated entirely to its discretion so long as made in accordance with the dictates of applicable statutes and regulations or, if made after a hearing, are subject to judicial review only in the Federal courts pursuant to subdivision (g) of section 405 of title 42 of the United States Code.

The four cases cited by the administratrix on this point are inapposite. The first case upon which she relies is *Allan Dee-Wayne Residential Center v Department of Social Servs.* (80 Mich App 137). In *Allan* a disabled person under 65 years of age was living in a house for the aged and was receiving supplemental security income payments from the Michigan DSS. The DSS determined to reduce his payments from the rate authorized for aged care to the lesser rate authorized for independent living care, upon the ground that only persons over 65 years of age were entitled to the greater payments. The funds used to make the payments came partly from Federal Social Security and partly from State contributions mandated by Federal law. The State DSS completed a referral form for the recipient and ultimately the Social Security Administration deter-

mined both eligibility and the amount of the payment. Thus the Michigan DSS determination that the plaintiff's grant was to be lowered was nothing more than a repetition of what it had been told by the Social Security Administration. The *Allan* case holds that "the courts of this state have no jurisdiction to hear cases involving SSI rate disputes" (80 Mich App 137, 141, *supra*) upon the ground that subdivision (g) of section 405 of title 42 of the United States Code required that such disputes be heard in Federal District Court, thus depriving State courts of concurrent jurisdiction. *Allan* is distinguishable because it is a rate dispute brought to ultimately review an initial determination of the Social Security Administration concerning the proper amount of payments.

In *Weinberger v Salfi* (422 US 749), a class action suit was brought by a widow who had been married approximately six months prior to the death of her husband, to declare unconstitutional a provision of the Social Security Act which defined "widow" and "child" so as to exclude surviving wives and stepchildren who had their relationship to a deceased wage earner for less than nine months prior to his death. The widow had applied for and had been denied Social Security benefits by reason of the statute. The action was also brought on behalf of "all widows and stepchildren of deceased wage earners who are denied widow's or children's insurance benefits because the wage earner died within nine months of his marriage to the applicant or (in case of a stepchild) the applicant's mother" (p 755). A three-Judge Federal court certified the class, held the statute unconstitutional and granted relief directing the Secretary of the Department of Health, Education and Welfare (HEW) to pay benefits. So far as relevant here, the Supreme Court of the United States held that the certification of the class was improper, *inter alia,* because subdivision (g) of section 405 of title 42 of the United States Code provides only for District Court review of administrative determinations of the Secretary of HEW and there was no showing that such determinations had been made with respect to unnamed members of the class. Only the named plaintiffs were entitled to sue in the Federal courts because they had applied for benefits and after a hearing their

applications had been rejected. The administratrix in the instant case contends that the *Weinberger* case applies because it holds that an application and an administrative determination thereon by the Social Security Administration are necessary before a court action may be commenced and then only in the Federal, not State courts. The answer to this argument is that *Weinberger* is distinguishable because it involves a suit against Federal officials regarding an initial determination concerning eligibility whereas this case does not.

In *Morris v Weinberger* (401 F Supp 1071) the plaintiff was a mental patient in a hospital run by the Maryland Department of Health and Mental Hygiene (MDHMH) and he was entitled to OASDI benefits as a dependent of his wage earner father. The MDHMH applied on his behalf for the payment of benefits and to be named his representative payee. The application was granted and thereafter MDHMH utilized the benefits it received for the cost of the patient's care. Some months later the patient commenced an action against the Secretary of HEW and others to recover the moneys the Social Security Administration had paid to the MDHMH and for injunctive and declaratory relief on behalf of himself and several overlapping classes of persons, alleging that the Social Security Administration had erred as a matter of law in appointing the MDHMH as his representative payee because MDHMH, as his creditor, was ineligible for that appointment and that, accordingly, the Social Security Administration was liable to the patient for the sum disbursed to the improperly designated representative payee. In a supplemental opinion handed down after the decision in *Weinberger v Salfi* (422 US 749, *supra*), the court held, on the authority of the *Weinberger* case, that the plaintiff could not maintain an action against public officials in the Social Security Administration without first exhausting administrative remedies. The *Morris* case is distinguishable from the instant case because the defendants therein were Federal public officials and the question was whether their determination designating a particular person as a payee was improper (cf. 20 CFR 404.902[p]). In this case the Federal officials are not parties and none of their acts has been called into

question. Rather, it is the acts of the representative payee which have been questioned.

The last of the four cases cited by the administratrix for the proposition that the courts of this State lack jurisdiction over the question of whether the representative payee was remiss in its duty to obtain payment from the father for the care of the children before expending their OASDI benefits for that care, is *Giberson v Hoerster* (339 SW2d 730 [Tex]). In *Giberson* a person of unsound mind named Woodward had been confined in the Austin State Hospital, and while he was a patient therein the superintendent of the facility, Sam Hoerster, was named by the Social Security Administration as the representative payee of OASDI benefits due to Woodward. Thereafter Woodward was furloughed from the hospital and Dorothy Giberson was appointed as his legal guardian. The guardian sued the representative payee to compel him to turn over the OASDI funds he held in trust for Woodward. The trial court denied relief to the plaintiff and she appealed. On appeal the court affirmed stating (339 SW2d 730, 731, *supra*):

"Appellant has not made application to the Social Security Administration to be designated as being entitled to receive benefits on account of Mr. Woodward under the provisions of the Act.

"Irrespective of the character of the funds on hand with appellee as being the property of the ward or being held for the ward's use and benefit, we believe that the funds should not be disturbed except under the direction of the Administrator of the Act under the provisions thereof."

The *Giberson* case is distinguishable because there the contest was between a State appointed guardian and a Federally appointed representative payee as to who would have control over the OASDI funds. The court answered that the Federally appointed trustee had the right to the funds and that the guardian's remedy was to apply to the Social Security Administration for a change in the representative payee. Here, we do not have a dispute over who has the right to hold the OASDI benefits but rather whether the named representative payee has improperly expended them.

The four cases cited by the administratrix dealt with eligibility, the amount of benefits, whether Federal officials had appointed an improper representative payee, and who should control the funds as representative payee. Our case deals with the representative payee's account, that is with the propriety of his expenditures of benefits. The precise issue raised in this case was decided in the case of *Bell v Secretary of HEW* (US Dist Ct, EDNY, 70 Civ 407, Feb. 2, 1971) which, unlike the cases cited by the administratrix, concerns the account.

The regulations of the Social Security Administration provide that the representative payee must account to the administration, on request, for the use of the benefits received by him on behalf of the beneficiary (20 CFR former 404.1609, present 404.2065). It is upon that reporting requirement that the administratrix bases her contention that the account of the representative payee is a Federal concern and that its propriety can only be reviewed administratively, and then only in the Federal District Courts. In *Bell* the plaintiff was for some time an incompetent confined at a mental hospital. Plaintiff was entitled to the payment of OASDI benefits and the Social Security Administration granted the application of one Reginald Johnson, a friend of the plaintiff, to be named as his representative payee. Johnson received $3,080 on plaintiff's behalf. After a period of time Johnson advised the administration that he no longer wished to be representative payee because the plaintiff did not want him to pay any funds over to the hospital where he was confined and, as plaintiff's friend, Johnson did not wish to go against plaintiff's wishes. Accordingly, Johnson returned the unused benefits, interest which had been earned thereon, and two unnegotiated benefit checks. Thereafter, the administration granted the application of the hospital to be named as plaintiff's representative payee.

Approximately five years after Johnson had been relieved as representative payee, the plaintiff submitted statements to the Social Security Administration claiming that Johnson had misused $1,301 of the benefits by making unauthorized and inappropriate withdrawals from the amount held in trust. Johnson submitted a statement to

the administration explaining his actions and on June 20, 1969 it issued what it called a "Special Determination" which concluded that although Johnson showed "poor judgment * * * it appears that no misappropriation of funds existed". Plaintiff requested reconsideration and thereupon the Social Security Administration adhered to its original determination. Plaintiff filed a request for a hearing which the administration denied. Administrative review by the appeals council determined that the denial of a hearing was correct. Plaintiff then commenced an action against the Secretary of HEW and against Johnson to recover the benefits allegedly misused by Johnson.

The opinion of Judge JOHN F. DOOLING, JR., in the *Bell* case states in relevant part:

"The 'special determination' of June 20, 1969, was evidently related to 20 C.F.R. § 404.1609, which visualizes that the Administration may cease to certify payments to a representative payee who fails adequately to account for benefit payments. But neither the Act nor the regulations provide for any means by which the Administration can recover funds misappropriated by a representative payee and reissue them to the beneficiary. Subsection (k) of § 205, 42 U.S.C. § 405(k), as noted, provides that payment to a representative payee, if otherwise valid, is a 'complete settlement and satisfaction of any claim, right, or interest in and to such payment.' The regulations, 20 C.F.R. §§ 404.1601-404.1610 broadly provide for supervision of representative payees. The representative payee's application of payments on the beneficiary's behalf is subject to 'review by the Administration,' § 404.1603, but the only sanction provided for is the cessation of certification of payments to the representative payee if he fails to submit an accounting, § 404.1609.

"Thus even if the Administration had found evidence of misappropriation it would have been powerless to make compensating payments to Mr. Bell. Since no decision made by the Secretary could have affected any of plaintiff's rights to payment of benefits, no hearing was required by section 205(b) of the Act, 42 U.S.C. § 405(b). Section 205(h), 42 U.S.C. § 405(h) provides that 'No findings of fact or decision of the Secretary shall be reviewed by any * * *

tribunal * * * except as herein provided.' And Section 205(g), 42 U.S.C. § 405(g) states that 'Any individual, after any final decision of the Secretary made <u>after hearing</u> to which he was a party * * * may obtain a review of such decision by a civil action * * *' (Underlining added).

"The Administration is, therefore, correct in its contention that no agency action under the Social Security Act was taken which (1) entitled plaintiff to a statutory hearing, and (2) entitled plaintiff to review the agency action in the Court for its substantive correctness and the adequacy of its evidentiary foundation as a grant or withholding of statutory benefits. However, this Court does have the limited jurisdiction, pointed out in *Cappadora* v. *Celebrezze*, 2d Cir. 1966, 356 F.2d 1, 5, to determine whether or not the administrative action that was taken was authorized by Section 205(j), (k) [42 U.S.C. § 405(j), (k)]. The record requires the conclusions that (1) the Administration was authorized to certify payments to Johnson as representative payee for the period during which it continued to make them to him and, in consequence, owes nothing to plaintiff Bell, but (2) the Administration had no power to determine as between Johnson and Bell that Johnson was not indebted to Bell for any part of the funds that Johnson received to administer for Bell's use, and the Administration findings are of no legal effect whatever as a determination of rights as between Johnson and Bell. The Administration was empowered to inquire into the accounts between Johnson and Bell only for the purpose of determining whether to continue or to cease certifying payments to Johnson and in the present case Johnson had surrendered his status as representative payee and declined to accept further certifications of payment before the special determination was made. It follows that the special determination must be in all respects set aside as attempted administrative action not authorized by the statute.

"The result is that the rights of Bell against Johnson are unadjudicated. Those rights, unfortunately, cannot be adjudicated in this Court in this suit because there is neither diversity of citizenship nor jurisdictional amount, nor pendent jurisdiction under *United Mine Workers* v. *Gibbs*,

1966, 383 U.S. 715, 726. Plaintiff may, if he wishes to pursue the matter, sue Johnson in the state courts."

What the *Bell* case means simply is that the review of the reports which may be required by the Social Security Administration of a representative payee pursuant to 20 CFR 404.2065 (formerly 20 CFR 404.1609) is solely to determine whether to continue making future payments to the named representative payee. The administration is not authorized either by statute or regulation to determine disputes between the beneficiary and the representative payee as to the propriety of the expenditure of benefits by the latter. Since there is no claim in this case that the administration improperly paid the benefits to the DSS as representative payee, those payments constituted a complete satisfaction of the Government's obligation with respect thereto (US Code, tit 42, § 405, subd [k]). Such being the case, the Federal Government has no interest in the funds properly paid to the DSS and it has no power to inquire into their expenditure other than to ascertain whether to make future payments to the DSS as representative payee.[2] It lacks the power to determine disputes between the representative payee and the beneficiary as to the propriety of expenditures of benefits held in trust by the former because it has no interest in those funds.[3] Thus, the argument of the administratrix, that the courts of this State have been ousted from jurisdiction and that the children must be relegated to administrative proceedings before the Social Security Administration and to review in the Federal courts, is without merit.

The next contention raised by the administratrix is that if the courts of this State have not been ousted from jurisdiction, "the Social Security Act does not create a

2. The children in this case have now reached their majority, representative payment is no longer necessary and there is no need for a determination by the Social Security Administration concerning misuse of their benefits for the purpose of ascertaining whether to make future payments.

3. Indeed, in the course of revising 20 CFR former 404.1609 and promulgating 404.2065 as its replacement, the Social Security Administration expressly rejected suggestions that it be made liable for misuse of funds by a representative payee, that the question of misuse be made an appealable determination and that it be granted a more affirmative role in attempting to recover misused benefits (see 47 Fed Reg 30471).

private cause of action in favor of persons alleging injury by reason of a representative payee's misuse of Social Security benefits". In other words the administratrix claims that under the Social Security Act no action lies in favor of a beneficiary of OASDI benefits against a wrong-doing representative payee. She bases her argument upon the cases of *Touche Ross & Co. v Redington* (442 US 560), and *Transamerica Mtge. Advisors v Lewis* (444 US 11). When the cited cases are read uncritically they seem to stand for just the proposition for which they are cited, namely that there is no cause of action for breach of a representative payee's duty and that accordingly the children had no right to restitution of the OASDI funds improperly expended by the DSS. Something about that argument, which implies that the children are without a remedy for wrongdoing by their representative payee, is highly suspect.

Both *Touche Ross* and *Transamerica* (*supra*) concern themselves with whether a Federal private right of action may be judicially inferred to obtain relief from injuries caused by another's violation of a Federal statute. In the earlier case of *Cort v Ash* (442 US 66, 78) the Supreme Court had enunciated four factors to be applied in deciding whether to imply a Federal right of action. The effect of the *Touche Ross* and *Transamerica* cases was to declare that those four factors were not to be accorded equal weight, and that primary importance was to be placed upon whether Congress explicitly or implicitly intended to create or deny a remedy for breach of the Federal statute in question, secondary importance was to be accorded the question of whether the plaintiff was one of the class for whose especial benefit the statute was enacted, and the other factors enunciated in *Cort* were then to be considered (see Note, Implied Private Rights of Action Under Federal Statutes: Congressional Intent, Judicial Deference, or Mutual Abdication, 50 Fordham L Rev 611, 615-622).

Assuming, but not deciding, the correctness of the administratrix' argument that there is no evidence of congressional intent to create a remedy for a representative payee's breach of his fiduciary duties, it is our view that whether or not a Federal cause of action exists is irrele-

vant. The implication of a Federal cause of action for breaches of Federal statutes is of importance in many cases only because it furnishes the jurisdictional predicate for access to the Federal courts (US Code, tit 28, § 1331; see Note, 50 Fordham L Rev 611, n 2, and accompanying text), and not, as the administratrix would have it, because absent such an implied Federal right of action an injured party is without a remedy for wrongs committed against him. The case of *Touche Ross & Co. v Redington* (442 US 560, *supra,* revg 592 F2d 617, and reinstating 428 F Supp 483), relied upon by the administratrix, is a prime example of that principle.

The *Touche Ross* case involved the failure of a stockbrokerage firm, Weiss Securities, Inc. Touche Ross & Co. was an accounting firm which audited its books and prepared the annual reports of its financial condition required by subdivision (a) of section 17 of the Securities Exchange Act of 1934 (US Code, tit 15, § 78q, subd [a]). When the firm failed, a trustee was appointed for the liquidation of its business and the Securities Investor Protection Corporation (SIPC) made certain advances to satisfy, up to certain statutory limits, the claims of Weiss' customers and other creditors. Thereafter the trustee and the SIPC determined that certain of Weiss' former officers had conspired to conceal its operating losses during 1972 by falsifying financial reports required to be filed with regulatory authorities pursuant to subdivision (a) of section 17 of the 1934 act. Therefore, the trustees and the SIPC decided to sue the firm of accountants, Touche Ross & Co., upon the theory that by reason of its improper audit and certification of the financial statements and section 17 (subd [a]) questionnaire, the true financial condition of Weiss did not become known until it was too late to take remedial action to forestall liquidation or to lessen the adverse financial consequences of such a liquidation to the firm's customers.

The SIPC and trustees first sued the accountants in the courts of New York alleging breaches of their professional duty under our common law. They let the State action languish and thereafter commenced an almost identical suit in the United States District Court for the Southern District of New York alleging that the accountants (1) had

breached their duties under subdivision (a) of section 17 of the 1934 act and were liable in damages therefor and (2) were liable under the State common-law causes of action. The District Court dismissed the action, the Second Circuit Court of Appeals reversed and reinstated the complaint and the Supreme Court granted certiorari (439 US 979).

When the opinion of the Supreme Court in *Touche Ross & Co.* is read it deals only with whether a private cause of action can be implied from subdivision (a) of section 17 of the Securities Exchange Act of 1934. The question, said the court, was "whether Congress intended to create the private right of action asserted" (442 US 560, 568, *supra*), and it concluded that since the section simply required the filing of reports and there was no showing of an alternative congressional intent to create an implied private cause of action in favor of anyone, no such cause of action would be implied. Accordingly, it reversed the Court of Appeals, thereby effecting a reinstatement of the dismissal of the action by the District Court.

What the Supreme Court was impliedly saying in *Touche Ross & Co.* was not that the trustee and the SIPC were without any remedy for the wrongs of the accountants, but only that their right to sue did not arise under the laws of the United States because subdivision (a) of section 17 of the 1934 act did not create a Federal cause of action. Accordingly, the Federal suit had to be dismissed because there was no Federal claim, and the State common-law claims could only be considered in the Federal courts if there was diversity of citizenship or if pendent to a viable Federal claim (see District Court opinion, 428 F Supp 483, 492-493, *supra*). Since there was neither diversity jurisdiction nor a claim arising under Federal law, the Federal courts lacked jurisdiction over the State common-law causes of action. However, the State suit which had been previously commenced, was still viable (see 442 US 560, 566, n 7, *supra*).

In the instant case, subdivision (j) of section 405 of title 42 of the United States Code, and the regulations promulgated thereunder (20 CFR former 404.1601 *et seq.*, present 404.2001 *et seq.*) made the representative payee a trustee of OASDI funds due to the beneficiary. Irrespective of

whether that subdivision or the regulations in question give rise to an implied Federal cause of action for wrongdoing by the representative payee, it is clear that under New York law a trustee will be required to account in equity to the beneficiary for his stewardship over the principal of the trust (1 NY Jur 2d, Accounts & Accounting, §§ 29, 30). Thus a person is entitled to an accounting where he demonstrates the existence of a fiduciary relationship created when the defendant was entrusted with his money or other property and is therefore bound in honesty to reveal his dealings with it. Once the defendant trustee has rendered his account the plaintiff will be entitled to recover against the defendant personally if it is shown that the defendant breached his fiduciary duties by committing some wrongdoing in connection with the property entrusted to his care, thereby causing loss to the plaintiff (1 NY Jur 2d, Accounts & Accounting, § 30). Accordingly, we conclude that although the administratrix may be correct that the statute and regulations do not create a Federal cause of action in favor of the beneficiary to recover for wrongdoing by the representative payee, she is incorrect in her assumption that there is no remedy at all for such wrongdoing. The representative payee is liable under the common law of this State in an action for an equitable accounting.

The administratrix and the DSS contend that if there is a State remedy, the children are the only ones who may assert it and then only in the Supreme Court, and the Surrogate both lacked subject matter jurisdiction over the claim and erred in asserting it *sua sponte*. These are difficult arguments and are complicated by the fact that claims by the children to recover the sums due to them could be made in either of two different ways. First, they could make a claim against their father's estate upon the ground that he owed them a primary duty of support during his lifetime which he breached, requiring the expenditure of their own funds for their support. Alternatively they could sue the DSS alleging that it breached its fiduciary duties to them by improperly expending the OASDI funds which it held in trust for their support and maintenance, without first having sought payment from their father who, as their surviving parent, owed them the

primary duty to support them according to their needs and his means. Basically these are just two different ways of looking at the same transaction. It is just a question of bookkeeping. Should the children suffer the debit to their OASDI account and seek to obtain a credit in a like sum from their father's estate, or should they seek to compel the DSS to recredit their OASDI account and then leave it to seek indemnification from their father's estate?

It should be remembered that this was only an intermediate accounting proceeding for the period from November 12, 1976, when the decedent's second wife qualified as administratrix, until July 18, 1978. During that period the DSS filed its claim against the estate and the administratrix rejected it. The Surrogate's opinion states that "[a] companion claim is made by the guardian ad litem for the children by reason of the expenditure of Social Security benefits received by the [DSS], as representative payee of the children for [their] care, support and maintenance" (104 Misc 2d 978, 979, *supra*).

A search of the original papers reveals that Samuel N. Barish was appointed guardian ad litem for Clifford and Jennifer Kummer by order of Surrogate BREWSTER dated October 12, 1978. The file does not appear to contain any written claim by him on behalf of the children against either the estate or the DSS. The brief for the children reveals that the son, Clifford, reached his majority on January 15, 1979 (after the closing date of the intermediate account) and that on May 20, 1979 he filed a claim against the estate for unpaid support, which was denied by the administratrix on May 22, 1979. Thus, although at least one of the children made a claim against the estate (the daughter recently reached her majority on August 28, 1982), that claim is not a part of this proceeding because it was made and rejected after the closing day of the intermediate account. It may, of course, be an issue in the final accounting proceeding.

The issue then is whether the Surrogate had subject matter jurisdiction to consider the potential claim by the children against the DSS in connection with this estate proceeding and whether, if he did, he erred in raising it *sua sponte*. While not as technically complex as some of the

other contentions in this case, the issue framed above is troublesome because there is little precedential guidance on the subject.

The Surrogate's Court is a court of limited subject matter jurisdiction (NY Const, art VI, § 12; 25 Carmody-Wait 2d, NY Prac, §§ 149:61, 149:62). The State Constitution creates the Surrogate's Court and confers jurisdiction "over all actions and proceedings relating to the affairs of decedents, probate of wills, administration of estates and actions and proceedings arising thereunder or pertaining thereto, guardianship of the property of minors" (NY Const, art VI, § 12, subd d), and "such equity jurisdiction as may be provided by law" (NY Const, art VI, § 12, subd e). SCPA 201 carries the constitutional scheme into effect, stating in subdivision 3 thereof: "The court shall continue to exercise full and complete general jurisdiction in law and in equity to administer justice in all matters relating to estates and the affairs of decedents, and upon the return of any process to try and determine all questions, legal or equitable, arising between any or all of the parties to any action or proceeding, or between any party and any other person having any claim or interest therein, over whom jurisdiction has been obtained as to any and all matters necessary to be determined in order to make a full, equitable and complete disposition of the matter by such order or decree as justice requires."

Where, as here, a claim against an estate is rejected, the Surrogate's Court has "generously expanded" jurisdiction to determine that claim on its merits as part of the judicial settlement of the fiduciary's account (Siegel, Practice Commentary, McKinney's Cons Laws of NY, Book 58A, SCPA 301, p 305; *Matter of Maki v Ziehm*, 55 AD2d 454, 456-457). Thus it is clear that the Surrogate had jurisdiction to determine the propriety of the rejection of the claim made against the estate by the DSS for unpaid child support. But did he have jurisdiction to determine the collateral question of the propriety of the expenditure of OASDI funds by the DSS to pay for the care of the children when funds from the father were not forthcoming? The children had a right to pursue their own claims against the estate. Another alternative would have been for them to have commenced a

plenary action against the DSS in the Supreme Court for breach of its fiduciary duties in administering the OASDI funds held by it in trust for their benefit. The fact that those other alternatives existed does not, however, require us to say that the Surrogate lacked jurisdiction and in any event erred in acting *sua sponte*.

The Surrogate's Court possesses ancillary and incidental jurisdiction to resolve matters in dispute between the parties which must be resolved in order to effect a complete disposition of a matter properly before it (*Matter of Piccione,* 57 NY2d 278, 287-289, mot for rearg den 58 NY2d 824; see, e.g., *Hull v Hull,* 225 NY 342; *Matter of Fitzpatrick,* 17 NYS2d 280, 292; *Matter of Mayer,* 59 NYS2d 558, 559). It could legitimately be argued that the Surrogate possessed ancillary jurisdiction to determine the propriety of OASDI expenditures by the DSS because (1) the question of the propriety of those expenditures is intertwined with the decedent father's duty of support and (2) determination of that question is necessary to effectuate a complete disposition of the present proceeding to settle the intermediate account.

There is, however, an additional substantial ground for holding that the Surrogate possessed subject matter jurisdiction over the OASDI fund question.

SCPA 201 (subd 1) states: "§ 201. General jurisdiction of the surrogate's court. 1. The court has, is granted and shall continue to be vested with all the jurisdiction conferred upon it by the Constitution of the State of New York, and all other authority and jurisdiction now or hereafter conferred upon the court by any general or special statute or provision of law, including this act". The revisers of the Surrogate's Court Act who drafted the SCPA stated that "[t]he purpose of this section is to expressly state in the SCPA the jurisdiction of the court [and] * * * to confirm the continuation of jurisdiction of matters encompassed by Surr. Ct. Act § 40" (see Revisers' Notes, McKinney's Cons Laws of NY, Book 58A, SCPA 201, p 48). Subdivision 6 of section 40 of the former Surrogate's Court Act, which was in effect incorporated into the SCPA by subdivision 1 of section 201, contained the following grant of jurisdiction: "6. To appoint and remove guardians for infants; to *compel*

*the payment and delivery by them of money or other property belonging to their wards;* to direct and control their conduct, and settle their accounts" (emphasis added).

The Surrogate's Court thus possesses jurisdiction over the guardians of the persons and/or property of infants (see SCPA 1701, 1702; 26 Carmody-Wait 2d, NY Prac, § 155:7, NY Const, art VI, § 12, subd d).

SCPA 202 states: "§ 202. Enumerated proceedings not exclusive. The proceedings enumerated in this act shall not be deemed exclusive and the court is empowered in any proceeding, whether or not specifically provided for, to exercise any of the jurisdiction granted to it by this act or other provisions of law, notwithstanding that the jurisdiction sought to be exercised in the proceeding is or may be exercised in or incidental to a different proceeding."

Professor Siegel explains this section as follows:

"This section is new in the SCPA. Its few lines provide procedural benefits which will likely have a broad impact on the court's proceedings.

"Whether or not the court may exercise an item of subject matter jurisdiction is, under section 202, no longer to be dependent upon the kind of proceeding in which the matter is raised. The matter is to be resolved only by reference to the court's subject matter jurisdiction, whether contained in the broad grants of SCPA article two or in any other grant, general or specific, in any other part of the SCPA or in any other law. *If from investigation of any of these jurisdiction-granting sources, including case-law construing them, the particular item is found to be within the competence of the court, it may exercise its jurisdiction regardless of the proceeding in which it is raised.* (Of course, the court must have the requisite personal jurisdiction over the parties sought to be bound, or a valid in rem substitute good as against the interests of such parties in the particular res, but these are matters distinct from subject matter jurisdiction, which is the only subject to which SCPA 202 is addressed.)" (Siegel, Practice Commentary, McKinney's Cons Laws of NY, Book 58A, SCPA 202, p 144; emphasis added; see, also, *Matter of Gebauer,* 79 Misc 2d 715, affd 51 AD2d 643.)

The jurisdiction of the Surrogate's Court over infant guardianships is concurrent with that of the Supreme and Family Courts (SCPA 1709; NY Const, art VI, § 7, subd a; Family Ct Act, § 661; 26 Carmody-Wait 2d, NY Prac, § 155:8). There are various types of guardianships, but within the meaning of the SCPA a guardian is one to whom letters of guardianship have been issued by a court of this State (SCPA 103, subd 24). In the instant case the children were "placed" with the DSS under section 1055 of the Family Court Act and thus it had custody of their persons. In addition it was appointed representative payee of the OASDI benefits by the Social Security Administration and it received the two $10,000 bonds from the father. It appears that the DSS was the *de facto* but not *de jure* guardian of their persons and property. However, the fact that the DSS was not formally granted letters of guardianship over the children does not mean that the Surrogate lacked subject matter jurisdiction over its use of their OASDI funds.

In legal theory infants are wards of the State from the moment of their birth until they attain their majority and the State stands as *parens patriae* to infants within its borders. Until his office was abolished in 1847 (NY Const of 1846, art XIV, § 8) the Chancellor of the State of New York was the officer charged with the duty to supervise the affairs of infants. The Chancellor had the power to appoint a guardian and that guardian served as the designee of the Chancellor's official power, and hence of the power of the State, subject to the duty to report to, and the supervision of, the Chancellor (see *Matter of Brown,* 80 Misc 4, 5).

With the adoption of the Constitution of 1846 and the abolition of the Court of Chancery, the Surrogate succeeded to the power of the Chancellor over the affairs of infants (see former Surrogate's Ct Act, § 173; cf. NY Const of 1846, art XIV, § 13). The present SCPA continues the Surrogate's power in that regard (SCPA 1701) which he shares concurrently with Judges of the Supreme and Family Courts. A court possessing such equitable powers has the duty to exercise them so as to protect the rights and property of infants (*Bogartz v Astor,* 7 Misc 2d 158), upon its own initiative whenever it deems it necessary (*Blag-*

*burn v Milrita Realty Corp.,* 204 Misc 74, 75; see 28 NY Jur, Infants, § 3).

The jurisdiction of the Surrogate's Court to exercise its power over the property and affairs of infants is qualified in SCPA 1702, which states in relevant part:

"§ 1702. Jurisdiction

"Where an infant has no guardian the court may appoint a guardian of his person or property, or of both, in the following cases:

"1. Where the infant is domiciled in that county or has sojourned therein immediately preceding the application."

From this section it appears that a Surrogate's Court has jurisdiction over infants domiciled in its county. Here the children were domiciliaries of Westchester County and the appeal is from a decree of the Surrogate of Westchester County.

The point of the foregoing discussion is that the Surrogate is the guardian of the rights and property of children domiciled in his county. He "may" issue letters of guardianship to permit another to act in his stead and subject to his supervision, but he need not do so. Where circumstances warrant, the Surrogate may, on his own motion, act to protect infants who are subject to the in personam jurisdiction of the court.

The next problem is that at the time the Surrogate acted, the son had reached his majority but the daughter had not. We do not view that fact as an insuperable obstacle to a finding that the Surrogate had subject matter jurisdiction. He certainly had the right under SCPA 202, 1701 and 1702 to exercise jurisdiction over the affairs of the infant daughter who was domiciled in his county. Since the OASDI funds of both the son and the daughter had been commingled and had been used to pay the joint cost of their care, to decide the rights of the infant daughter necessarily was to decide the rights of the son who had, since the events in question, reached his majority. Accordingly, it is our view that the interests of judicial economy and the doctrine of pendent jurisdiction gave the Surrogate the power to act to direct the DSS to return the OASDI funds of the son as well as the daughter of the decedent.

Although the Surrogate had the power to direct the DSS to refund the improperly expended OASDI funds to the accounts of the children and thereby to make it incur out-of-pocket expenses so that it could, in turn, seek reimbursement from the decedent's estate, it is our view that, for reasons stated *infra,* in the section of this opinion dealing with the question of interest, he improvidently exercised his discretion to do so.

■ The next issue raised with respect to the nonmedical claim is whether the stipulation settling the support proceeding which the DSS had commenced against the father during his lifetime is a bar to recovery by it, after the father's death, of amounts he should have paid as support. There are two simple answers to this claim. First, the stipulation expressly provides that the petition to compel the father to support his children was withdrawn "without prejudice". Accordingly, it does not bar a new claim for the same moneys. Second, the father, as part of the settlement, agreed to turn over two $10,000 bonds to the DSS which were in his possession and which were registered in the name of "Daisy Kummer as Custodian of Clifford and Jennifer Kummer under New York Uniform Gifts to Minors Act". The administratrix claims that decedent parted with these valuable bonds and would be prejudiced if the settlement were now undone. The contention is meritless. A gift under the Uniform Gifts to Minors Act "is irrevocable and conveys to the minor indefeasibly vested legal title to the security * * * given, but no guardian of the minor shall have any right, power, duty or authority with respect to the custodial property except as provided in [EPTL art 7, part 4]" (EPTL 7-4.3, subd [a]). What this means is that the bonds were already the property of the children. Furthermore, the named custodian was the deceased mother. So far as appears from this record the father had not been designated as successor custodian (see EPTL 7-4.7), and he thus had absolutely no right to the property. Accordingly he gave no consideration for the stipulation of settlement and, as the Surrogate correctly found, the estate would not be prejudiced by permitting the claim for the cost of the nonmedical care of the children to be determined on its merits.

The final question to be resolved concerning nonmedical care is the propriety of the amount that the Surrogate directed the DSS to reimburse to the children with interest. A review of the mathematics of the transactions in question is now necessary:

COST OF CARE

| | | |
|---|---|---|
| Nonmedical | | $18,807.04 |
| Medical | | 9,044.59 |
| | Total | $27,851.63 |

GROSS RECEIPTS BY DSS ON CHILDREN'S ACCOUNT

Cash

| | | |
|---|---|---|
| OASDI Benefits | | $17,527.20 |
| Payments by decedent | | 6,059.12 |
| | Subtotal | $23,586.32 |

Property

2 bonds at face value of ?
$10,000 each plus interest.

The parties stipulated that the payments from the decedent and the OASDI benefits were applied against the nonmedical costs of care and nothing else. It appears from the record that the father's cash contributions were expended first and the OASDI benefits were used thereafter. It can be seen that the total receipts exceeded the cost of nonmedical care:

| | |
|---|---|
| Receipts | $23,586.32 |
| Nonmedical care | 18,807.04 |
| Excess receipts | $ 4,779.28. |

Accordingly, at the date of the decedent's death, the accounts of each of the children should have contained $4,779.28 in unexpended OASDI benefits. Despite this, the Surrogate directed the DSS to repay the total sum of $17,527.20 (the gross amount of OASDI receipts) in equal amounts to the accounts of each of the children with interest. This seems to be patently incorrect because as shown above, $4,779.28 of those gross receipts were never expended by the DSS prior to decedent's death, that amount should have been in the children's accounts on the date of his death, and thus there was no need to repay that

amount, or to pay interest thereon. Accordingly, although the Surrogate could have directed repayment of OASDI benefits expended by the DSS for the cost of nonmedical care for the children, the repayment he ordered was too large and were we not modifying the decree appealed from by striking the award in question without prejudice to future proceedings in accordance herewith, we would at the very least, have reduced it by $4,779.28 to $12,747.92.

II MEDICAL ASSISTANCE

The question in this section of the opinion is whether the DSS can recoup moneys it expended on medical care for the children. Before exploring the statutes on this subject it is necessary to review the facts of the medical assistance claim. The DSS furnished medical assistance to the children between July 24, 1972 and July 24, 1976. The amount of such assistance was $9,044.59. No part of the OASDI benefits was used for or applied against medical assistance furnished to the children by the DSS.

The source of the funds used for medical assistance and the provisions of law under which they were furnished were initially in some dispute. The notice to admit served by the administratrix contained specific reference to Federal and State statutes and regulations under which the moneys were alleged to have been furnished. The DSS initially declined to admit that portion of the notice upon the ground that the citations to Federal and State statutes were not complete and it was only willing to state that medical assistance was a form of "public assistance" paid under the Social Services Law and the regulations thereunder. Finally, the parties stipulated in open court to a broad nonspecific citation of the authority under which the DSS furnished medical assistance, to the effect that it was furnished to the Kummer children pursuant to title XIX of the Federal Social Security Act (US Code, tit 42, § 1396 *et seq.*) as such title XIX is "implemented by New York Social Services Law and regulations". Thus we have been left with a very ambiguous statement of the authority for payment.

It should be remembered that the children were placed with the DSS by reason of their parents' neglect. Section

398 of the Social Services Law grants broad powers to a county commissioner of public welfare with whom such neglected children have been placed. He has the power and duty to "receive and care for any neglected * * * child placed or discharged to his care by the family court" (Social Services Law, § 398, subd 2, par [b]). This section clearly authorized the DSS to expend public moneys for the non-medical care of the children, but as stated above it did not do so, choosing instead to use their OASDI funds for that purpose. With respect to medical care to such neglected children, subdivision 6 of section 398 grants the commissioner the power to:

"(c) Provide necessary medical or surgical care in a suitable hospital, sanatorium, preventorium or other institution or in his own home for any child needing such care and pay for such care from public funds, if necessary. *However, in the case of a child or minor who is eligible to receive care as medical assistance for needy persons pursuant to title eleven of article five of this chapter, such care shall be provided pursuant to the provisions of that title.*

"(d) Ascertain the financial ability of the parents of children who become public charges and collect toward the expense of such child's care such sum as the parents are able to pay.

"(e) Collect from parents whose children have been discharged to his care by the family court such sums as they are ordered to pay for the maintenance of such children and report any failure to comply with such order to such court" (emphasis added).

The emphasized proviso in the foregoing quoted material means that although the commissioner has the power under section 398 to expend public moneys for the medical care of neglected children placed in his custody, he may not do so if they are "eligible" for medical care under title 11 of article 5 of the Social Services Law. Title 11 of article 5 is entitled "Medical Assistance for Needy Persons" and it governs the administration by the State of the Federal Medicaid program promulgated by title XIX of the Social Security Act. The parties stipulated that it was under these provisions that the medical assistance to the children was furnished.

In considering what follows, it should be borne in mind that there is a difference between eligibility and a right to payment. Thousands may, in fact, be eligible but only those who apply and whose eligibility has been certified by the local agency, are entitled to the payment of benefits.

The major dispute among the parties concerns whether medical assistance was "correctly paid", upon the theory that under certain circumstances there are limitations upon the recovery of medical assistance which was correctly paid.

Initially the administratrix asked the DSS to admit: "5 * * * (c) That all of the aforesaid medical assistance was 'correctly paid' as that term is used in 42 U.S.C., Section 1396a(a) 16, and in Article 5, Title 11 of the Social Services Law."

The DSS answered that it: "Denies the truth of the facts contained in paragraph 5(c) because the phrase 'correctly paid' contained in the statutes cited in said paragraph 5(c) is a conclusion subject to different interpretations."

As a result of this disagreement the administratrix framed the following third issue for trial: "[w]hether MA furnished under Title XIX to the Kummer children was correctly or incorrectly paid".

When the case came before the Surrogate the following colloquy concerning the propriety of the medical assistance resulted:

"MR. JULIE [attorney for the administratrix]: Item Number 3, Your Honor, we're going to brief that point for you. There is a difference as to how medical assistance should be handled on the basis of whether it was correctly or incorrectly paid. We decided to proceed with this issue without testimony and that if the Department wishes to make a point about this, they will raise it in their briefs as we will.

"THE COURT: The issue there, then, is whether the money should have been paid or should not have been paid, not the question to whom they were paid?

"MR. JULIE: It's a little more difficult than that, Your Honor. It is the estate's position that the Objectant cannot recover the cost of correctly paid medical assistance, be-

cause the Federal Statute limits their right to do so. That statute, your Honor, does not limit their right to recover incorrectly paid medical assistance, and this is a point that will be handled in the briefs rather than before the Court.

"MR. MCATAMNEY [attorney for the DSS]: And I would add to that, Your Honor, that since the statute clearly says that all medical assistance correctly paid cannot be recovered except under certain defined circumstances, *our position is, although, correctly paid, it can nonetheless be recovered. Although, correctly paid, the medical assistance can be recovered notwithstanding the provisions of the statute.*

"THE COURT: Well, are you in agreement as to what the circumstances of the payments are?

"MR. MCATAMNEY: Yes.

"THE COURT: Or were?

"MR. MCATAMNEY: Yes, we do agree.

"MR. JULIE: Yes.

"THE COURT: And that, then, is going to be submitted?

"MR. JULIE: The subject of the point of a brief.

"THE COURT: I will mark it submitted, and then, of course, you'll be briefing any questions that are submitted" (emphasis added).

The administratrix contends that the emphasized portion of the colloquy quoted above constitutes a factual concession that the medical assistance was correctly paid. It is clear, however, that the issue of recovery of such assistance was preserved. Suffice it to say that the right to recovery of the payments is a question solely of law flowing from the stipulated facts concerning the situation of the children and the means of their father to pay, and from the provisions of law governing the program under which the payments were made.

Finally in this regard, one of the issues framed for trial by the Surrogate was: "[w]hether at the time such medical assistance was furnished to the Kummer children, Philip Kummer had sufficient income and resources to pay for same as determined by the regulations of the Department cf Social Services".

In the proceedings before Surrogate BREWSTER the attorney for the administratrix stipulated: "Your Honor, the estate concedes that at the time medical assistance was furnished to the Kummer children, Philip Kummer had sufficient income and resources to pay for same as determined by the regulations of the Department of Social Services."

Not content with this, however, the DSS pressed to have the estate concede that the father had enough money to pay for both nonmedical and medical assistance to the children. Although the counsel for the administratrix said that he did not see the need for or relevance of such a concession, he agreed to stipulate that at the time "all care and assistance" was rendered by the DSS to the children, the father had sufficient income and resources to pay for the cost of the same.

We must now turn to an examination of the law on the subject of the recovery of medical assistance paid under title 11 of article 5 of the Social Services Law, which governs the furnishing of medical assistance to needy persons. An understanding of this problem requires an odyssey through a complex web of rather imperfectly worded and cross-referenced statutes, many of which are considerable pages in length.

The parties conceded that the medical assistance to the children was paid under title XIX of the Federal Social Security Act and the provisions of New York law and regulations enacted thereunder. Title XIX governs the "Medicaid" program and imposes certain mandatory requirements on States wishing to participate and obtain Federal funding therefor. One of those requirements concerns the recovery of moneys disbursed through the program (US Code, tit 42, § 1396a, subd [a], par [18]). Pursuant to that requirement New York State enacted section 369 of the Social Services Law, which states in relevant part:

"§ 369. Application of other provisions

"1. All provisions of this chapter not inconsistent with this title shall be applicable to medical assistance for needy persons and the administration thereof by the public wel-

fare districts. Any inconsistent provision of this chapter or other law notwithstanding,

"(a) no lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under this title, except pursuant to the judgment of a court on account of benefits incorrectly paid on behalf of such individual, and

"(b) there shall be no adjustment or recovery of any medical assistance correctly paid on behalf of such individual under this title, except from the estate of an individual who was sixty-five years of age or older when he received such assistance, and then only after the death of his surviving spouse, if any, and only at a time when he has no surviving child who is under twenty-one years of age or is blind or permanently and totally disabled, provided, however, that nothing herein contained shall be construed to prohibit any adjustment or recovery for medical assistance furnished pursuant to subdivision three of section three hundred sixty-six of this chapter."

This provision can be divided into three parts, namely, paragraph (a), the first part of paragraph (b) up to the words "totally disabled", and the proviso which concludes paragraph (b).

Paragraph (a) means that the DSS cannot recover from a living *recipient* or impose a lien against his property for medical assistance which was correctly paid (see *Matter of Colon,* 83 Misc 2d 344, 356; US Code Cong & Admin News, 1965, vol 1, pp 2020, 2147). The DSS can, however, recover *from the recipient* all benefits which were incorrectly paid. The conclusion that paragraph (a) concerns only recipients flows from the fact that it prohibits liens on the property of "any individual * * * on account of medical assistance paid * * * *on his behalf*" (emphasis added).

The first portion of paragraph (b) prohibits recovery of correctly paid medical assistance from the estate of the recipient (it refers to "such individual", meaning the individual mentioned in the preceding paragraph) unless (1) the recipient was 65 or over when he received assistance, (2) his surviving spouse, if any, has since died and (3) he leaves no children under 21 or who are blind or perma-

nently and totally disabled (see *Matter of Davis,* 57 NY2d 382; *Matter of Colon,* 83 Misc 2d 344, 356, *supra*).

Although the administratrix has indulged in considerable arguments concerning the foregoing provisions, they are plainly inapplicable because here the DSS is not seeking to recover from the recipient children but rather from the estate of their deceased father. We must then turn to the proviso which concludes paragraph (b). The other provisions having proved inapplicable, the DSS must either be entitled to recover the medical assistance rendered to the children under that proviso or not at all.

The proviso says that nothing in section 369 shall be construed to prohibit recovery of medical assistance furnished pursuant to subdivision 3 of section 366, which states:

"3. (a) Medical assistance shall be furnished to applicants in cases where, although such applicant has a responsible relative with sufficient income and resources to provide medical assistance as determined by the regulations of the department, the income and resources of the responsible relative are not available to such applicant because of the absence of such relative or the refusal or failure of such relative to provide the necessary care and assistance. In such cases, however, the furnishing of such assistance shall create an implied contract with such relative, and the cost thereof may be recovered from such relative in accordance with title six of article three [Social Services Law, § 101 *et seq.*] and other applicable provisions of law.

"(b) The provisions of this subdivision shall not be construed to diminish the authority of a social services official to bring a proceeding pursuant to the provisions of this chapter or other provisions of law (1) to compel any responsible relative to contribute to the support of any person receiving or liable to become in need of medical assistance, or (2) to recover from a recipient or a responsible relative the cost of medical assistance not correctly paid."

Section 366 is entitled "Eligibility". It governs the provision of medical assistance to various persons. The statute authorizes medical assistance to a child under the age of 21 years receiving care away from his own home in accor-

dance with title 2 of article 6 (Social Services Law, § 395 *et seq.;* here the children were receiving such care under section 398 [subd 2, par (b)] of that title) if he does not have sufficient income and resources, "including available support from his parents" to meet all costs of required medical care (Social Services Law, § 366, subd 1, par [a], cl [3]). That provision clearly does not apply in this case since here it is conceded that the father had ample resources to pay for the care of the children. Subdivision 3 of section 366 parallels the foregoing provision regarding children without resources, by providing in paragraph (a) thereof that medical assistance shall be furnished to "applicants" where, although they have responsible relatives with sufficient income and resources, such income and resources are unavailable because of "the refusal *or failure* of such relative to provide the necessary care and assistance" (Social Services Law, § 366, subd 3, par [a]; emphasis added). In such cases the furnishing of care by the DSS creates an implied contract with the responsible relative. The children were clearly eligible for benefits under that subdivision because their father, although possessed of the means to do so, failed to provide for their support and medical care.

■ The parties have not pointed to any other applicable Medicaid eligibility provision, and we can find none. If an application was made by the DSS on behalf of the Kummer children for payment of Medicaid to them under section 366 (subd 3, par [a]) of the Social Services Law, payments actually made on their behalf were correctly paid and would, by the terms of paragraph (a) be recoverable from the father's estate.[4] Conversely, if there was no applica-

4. Subdivision 3 of section 366 of the Social Services Law states that medical assistance shall be furnished to "applicants" and there is no proof of any application for such medical assistance in this case. An attempt to ascertain whether an application is needed in all cases necessitates an odyssey through the regulations of the State Department of Social Services. The regulations provide that certain persons are categorically eligible, that is they need no application. Thus 18 NYCRR 360.1 (a) provides that "[i]f a person or family household applies for public assistance on the State-prescribed form and is determined to be eligible for public assistance, no separate application for medical assistance shall be required." Under that regulation, if the children were entitled to public assistance they were also entitled to medical assistance.

This appears to have been a child welfare case. Those case records from the DSS which are in the appendix bear an alphabetical prefix to the case number which identifies the category of assistance. Here the prefix was "CW", meaning, the child welfare category.

tion, such payments were incorrectly paid and would be recoverable under section 366 (subd 3, par [b]).

Paragraph (b) has been quoted in full earlier in this opinion. In relevant part, it states that "[t]he provisions of this subdivision shall not be construed to diminish the authority of a social services official to bring a proceeding pursuant to the provisions of this chapter [the Social Services Law] or other provisions of law * * * to recover from a recipient or a responsible relative the cost of medical assistance not correctly paid". By its terms paragraph (b) of subdivision 3 is thus not a grant of authority to recover incorrectly paid medical assistance; it is just a statement that paragraph (a) is not intended to diminish such authority to do so as is granted elsewhere. But where?

It is our view that the above quoted language of paragraph (b) refers to sections 101 and 104 of the Social

---

18 NYCRR former 424.5 (e) provides that an application for public assistance in the child welfare category "is not required when the Family Court commits or places a child directly to or with an authorized agency which is *not* a social services official" (emphasis added). Here, however, the placement was with the Westchester County DSS and under the applicable definitional statute it was an authorized agency (Social Services Law, § 371, subd 10, par [b]) but it was also a "social services official" within meaning of that term (Social Services Law, § 2, subds 14, 17). This means that under the regulations, the DSS had to file an application for public assistance for the children in the child welfare category (18 NYCRR former 424.5 [a]). There is no proof that it did so. Absent such proof, the fact that the DSS paid public assistance for the nonmedical care of the children will not carry with it the authority to pay medical assistance.

The next question is whether there is any other provision which would excuse the DSS from the need to file an application for medical assistance under the Medicaid program. We can find none. In fact, to the contrary, 18 NYCRR 360.1 (b) (3) provides that with respect to requests for medical assistance only that "[a]pplications for medical assistance for children placed in the custody of * * * a local social services commissioner, who are not classified ADC/FC, may be made on an approved facsimile of the State prescribed form. Children who are classified ADC/FC receive medical assistance because of their eligibility for ADC/FC." This seems to indicate that children who are not in the ADC/FC category (ADC/FC refers to Aid to Dependent Children/Foster Care) must file an application. A reading of the relevant statute concerning aid to dependent children in foster care indicates that the children in this case were not eligible for relief in that category (see Social Services Law, §§ 358-a, 349).

The statutes and regulations regarding the categories of nonmedical assistance and the need for a formal application for medical assistance to persons already receiving nonmedical assistance are so numerous and confusing that we cannot with any certainty, on this ambiguous record, say exactly why medical assistance was furnished or whether some regulation excused the need for an application. What we can say is that the father owed the children a duty of support (Family Ct Act, § 413; Social Services Law, § 101). That duty encompassed the obligation to pay for necessary medical expenses (*Clough v Board of Educ.*, 56 AD2d 233; *Murray v Murray*, 47 NYS2d 837). The children had valid medical expenses and the father failed to pay them although, as stipulated, he had the means to do so. The DSS paid the medical expenses with Medicaid funds. What we have here then is a situation in which the DSS could have correctly paid Medicaid to the children if they were "applicants" (Social Services Law, § 366, subd 3, par [a]). If payments were correctly made under section 366 (subd 3, par [a]), they are, by its terms, recoverable from the father's estate.

Services Law, which have already been quoted in full in connection with the right to recover nonmedical assistance.

Briefly, section 101 says that a parent of a recipient of public assistance under 21 years of age shall be responsible for his support. The term "public assistance and care" includes medical assistance for needy persons (Social Services Law, § 2, subd 18). There is no question that the children were recipients of medical assistance. Section 104 says, *inter alia,* that a public welfare official may bring an action against the estate of a person who dies leaving real or personal property, if that person, or anyone for whose support he is or was liable, received public assistance and care during the preceding 10 years, and shall be entitled to recover up to the value of such assistance or care. "*Any* public assistance or care received by such person shall constitute an implied contract" (Social Services Law, § 104, subd 1; emphasis added). Section 101 does not talk in terms of whether the assistance was correctly or incorrectly paid. It simply says that "any" assistance received may be recovered from the responsible relative. It is our view, that the word "any" as used in section 101 of the Social Services Law includes both correctly and incorrectly paid medical assistance to children who, at the time the payments were made, had a responsible relative who was possessed of the means to pay for such assistance.

Thus the answer to all the rather hypertechnical arguments raised in the briefs concerning medical assistance is quite simple. It does not matter whether the care was correctly or incorrectly paid. The children needed it; the DSS paid it; the father had the means but failed to pay it; the DSS can recover it from the estate under section 366 (subd 3, pars [a], [b]) and sections 101 and 104 of the Social Services Law.

III PREDECISION INTEREST

There are three periods applicable to the award of interest, namely (1) to the date of verdict, decision or report (see CPLR 5001), (2) from the date of verdict, decision or report to judgment (CPLR 5002) and (3) interest upon the judgment itself (CPLR 5003). In this case the dispute concerns

whether interest prior to the date of decision was properly awarded and, if so, whether the court erred in selecting the date from which interest began to run.

CPLR 5001 states:

"Interest to verdict, report or decision

"(a) Actions in which recoverable. Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

"(b) Date from which computed. Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

"(c) Specifying date; computing interest. The date from which interest is to be computed shall be specified in the verdict, report or decision. If a jury is discharged without specifying the date, the court upon motion shall fix the date, except that where the date is certain and not in dispute, the date may be fixed by the clerk of the court upon affidavit. The amount of interest shall be computed by the clerk of the court, to the date the verdict was rendered or the report or decision was made, and included in the total sum awarded."

As stated above, it is our opinion that the DSS has the right to recover from the estate the costs of any nonmedical and medical care actually disbursed by it for the children under the provisions of section 104 of the Social Services Law, which states in relevant part that "[a]ny public assistance or care received by such person shall constitute an *implied* contract" (emphasis added).

There are two kinds of implied contracts, namely (1) those that are implied in fact, as where the actions of the

parties and not their words indicate that they intended to form an actual contract and (2) those that are implied in law, also called quasi contracts, which the law implies from the circumstances, even though the parties never intended to form an actual contract, so as to prevent an unjust enrichment (see 22 NY Jur 2d, Contracts, § 446; 50 NY Jur, Restitution and Implied Contracts, §§ 1-3). There were two remedies in cases of such implied in law contracts, namely an action at law for assumpsit or an action in equity for unjust enrichment (50 NY Jur, Restitution and Implied Contracts, §§ 2-3). Because of the merger of law and equity the fact that there once were two remedies for the same relief is now relatively unimportant. However, CPLR 5001 says that in actions based on "contract" the court shall award prejudgment interest, but where the action is equitable in nature it may or may not award such interest in its discretion. It appears however that the trend has been, even in equity actions based on contract, to award prejudgment interest as of right (see 5 Weinstein-Korn-Miller, NY Civ Prac, par 5001.06, pp 50-21, 50-22).

On what date should the interest begin to run? Before that question can be answered we must first review what the Surrogate did.

Surrogate BREWSTER's initial decision held, *inter alia,* (1) that the DSS had a good claim against the estate for medical care in the sum of $12,747.92, plus interest at 6% from July 24, 1976, the date of the father's death, until repaid, (2) that the DSS could not recover against the estate for medical assistance to the children and (3) that the DSS should repay the sum of $17,527.20, representing OASDI benefits, to the accounts of the children plus interest at 6% per annum, until repaid (the initial decision did not state the date upon which such interest was to begin to run). Thereafter the Surrogate rendered an amended decision reducing the rate of interest on the repayment of OASDI funds from 6% to 3% per annum pursuant to section 3-a of the General Municipal Law.

With respect to nonmedical care our conclusion, stated above, is that the Surrogate had the power to order the refund by the DSS of OASDI funds expended for the care of

the children to their accounts and thus to make it out-of-pocket, so that it could seek reimbursement from the estate. It is not until the question of interest is considered that it becomes apparent that the solution adopted by the Surrogate cannot make the children whole. The reason for this is that predecision interest is to run from the earliest ascertainable date upon which the plaintiff's cause of action existed. Here the cause of action by the DSS for reimbursement from the estate will not exist until it refunds the OASDI funds to the children and becomes out-of-pocket. It is the decree in this case which directs the reimbursement, so how can the DSS be entitled to predecision, or for that matter, prejudgment interest?

Had this been a proceeding to settle the final account of the administratrix we might have affirmed the approach taken by the Surrogate, simply as a means of cutting the Gordian knot and effecting a complete determination of the rights of the parties. However, this is only an intermediate accounting. At the time the DSS filed its claim against the estate it was not out-of-pocket as to the costs of nonmedical care.

It is our view that the Surrogate properly acted to resolve the legal issues concerning the father's duty of support and the propriety of the expenditures of the OASDI funds by the DSS, but that he should have sustained the denial by the administratrix of the DSS claim on this intermediate accounting without prejudice to either (1) a new claim by the DSS prior to the final accounting upon a showing that it had voluntarily restored the expended OASDI funds to the interest-bearing account of the children together with all interest such funds would have earned had they not been improperly withdrawn or, (2) claims by the children against the estate to recover support which their father should have provided but did not, resulting in the improper expenditure of their own resources to pay for the costs of their nonmedical care. Such claims may be determined either at a further intermediate accounting proceeding or at the final accounting of the estate. A voluntary payback approach as a prerequisite to the viability of a DSS claim against the estate is preferable to a compulsory order to do so by way of a decree because

the DSS can only be compelled to repay the principal of the OASDI funds with 3% interest. Section 3-a of the General Municipal Law limited recovery of interest against a county, and the DSS is a county department, to 3%. Since the funds were in an interest-bearing account they obviously would have drawn more than 3% interest. If the DSS does not repay the children in full, they may recover their losses from the estate with interest at the full legal rate from the date of each expenditure of their OASDI funds (CPLR 5004).

The question of interest upon the medical assistance claim is clear. The court erred in denying recovery for medical assistance and the recovery we now order is with predecision interest to the DSS at the legal rate from the date of each of the separate payments of medical assistance. This is suggested by CPLR 5001 (subd [b]) which states that: "[w]here * * * damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."

Although calculating interest on each individual payment of medical assistance might involve a long account, we see no need to make interest run from a single intermediate date.

CONCLUSION

 Nonmedical Assistance

1. The father had a duty to support his children in accordance with their needs and his means. Since he had the means to fully pay the costs of all their care, their separate assets should not have been used to pay for the same.

2. The DSS was a fiduciary with respect to the OASDI funds and it breached its duty to the children by expending them on nonmedical care rather than utilizing public funds for the same and seeking recoupment from the father.

3. The Surrogate had jurisdiction to determine the propriety of the expenditure of OASDI benefits by the DSS because

a. Federal courts have not been granted exclusive jurisdiction over that question;

b. although the Social Security Act may not create a Federal cause of action to recover improperly expended OASDI benefits from a representative payee, the payee is a fiduciary and may be held liable on a cause of action for an equitable accounting under the laws of New York;

c. the Surrogate, as the successor to the Chancellor over the affairs of infants, had the right to *sua sponte* direct the fiduciary to repay the moneys to the children, who were domiciled in his county and subject to the in personam jurisdiction of the court, and he had the jurisdiction to do so even on this estate accounting proceeding under the authority of SCPA 202; and

d. although the Surrogate had the power to direct the DSS to repay the funds to the children and thereby make it out-of-pocket, he should have declined to exercise that power in this intermediate accounting proceeding, without prejudice to the rights of the DSS or children to assert claims against the estate prior to the final accounting.

4. The settlement of the Family Court support proceeding commenced by the DSS against the father is not a bar to relief.

Medical Assistance

1. Under the circumstances of this case, sections 101 and 104 of the Social Services Law authorize the recovery from a responsible relative or his estate of medical assistance actually paid for children, regardless of whether it was paid correctly or incorrectly.

2. Since the children were in the care of the DSS and had medical expenses, and since the DSS paid them, thereby discharging a duty of the decedent father, it has the right to recover the costs thereof from the estate so as to prevent an unjust enrichment.

Interest

1. Each separate expenditure by the DSS for medical assistance should bear predecision interest at the legal rate from the date of payment.

Accordingly the decree appealed from should be modified so as to (1) strike the third decretal paragraph thereof and

substitute therefor a provision sustaining the administratrix' rejection of the nonmedical claim by the DSS, without prejudice to a new claim by the DSS or the children in accordance with the foregoing opinion, (2) strike the fourth decretal paragraph in its entirety, and (3) strike the word "denied" from the sixth decretal paragraph and substitute therefor the words "granted, with interest at the legal rate from the date of each separate payment of medical assistance". As so modified the decree should be affirmed insofar as appealed from, without costs or disbursements.

LAZER, GULOTTA and BRACKEN, JJ., concur.

Decree of the Surrogate's Court, Westchester County, dated December 31, 1980, modified, on the law, by (1) deleting the third decretal paragraph thereof and substituting therefor a provision sustaining the administratrix' rejection of the nonmedical claim by the Department of Social Services of the County of Westchester, without prejudice to the rights of said department or Clifford and Jennifer Kummer to assert claims against the estate of Philip Kummer, deceased, prior to the final accounting, (2) deleting the fourth decretal paragraph thereof and (3) deleting the word "denied" from the sixth decretal paragraph thereof and substituting therefor the words "granted, with interest at the legal rate from the date of each separate payment of medical assistance". As so modified, decree affirmed insofar as appealed from, without costs or disbursements.